## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) WILLIAM HENRY JAMERSON,

Plaintiff,

v.

Case No. 25-cv-00179-JFJ

COMPLAINT

(1) THE CITY OF TULSA, OKLAHOMA;

(2) STEVE KUNZWEILER, in his official capacity;

(3) DENNIS LARSEN, in his individual capacity;

(4) DAVID WITT, in his individual capacity;

(5) JOHN HUNTER, in his individual capacity;

(6) DEBBIE DANIELS, in her individual capacity;

(7) ANN MORRIS, in her individual capacity;

(8) BECKY JOHNSON, in her individual capacity;

(9) HAYES MARTIN, in his individual capacity;

(10) KATHLEEN WHITEHEAD, in her individual capacity;

(11) MICHEAL BURGESS, in her individual capacity;

(12) JON COZAD, in his individual capacity;

(13) JAMES SLAY, in his individual capacity;

(14)TARA BRIANS, in her individual
capacity;

Defendants.                                                          Jury Trial Demanded

## **COMPLAINT**

Plaintiff William Henry Jamerson, by and through his attorneys, files this Complaint and

alleges and states as follows:

## **INTRODUCTION**

1.      On December 4, 1991, William Henry Jamerson, an innocent man, was

convicted of first-degree rape, rape by instrumentation, and robbery with a firearm. He was

sentenced to forty-four years in prison.

2.      Wrongfully convicted of brutal crimes he did not commit, Mr. Jamerson

served twenty-four years in prison. He maintained his innocence the entire time – even when he

could have earned an early release by falsely claiming guilt.

3.      Following his release from prison in 2015, Mr. Jamerson had to live as a convicted

felon and a registered sex offender – unable to find meaningful employment or enjoy the rights

afforded to other citizens.

4.      Committed to proving his innocence, Mr. Jamerson challenged his conviction in

the Tulsa County District Court.  Presented with overwhelming evidence of Mr. Jamerson's

innocence, on September 3, 2024, the Court vacated Mr. Jamerson's conviction and issued a

finding of actual innocence.

5.      Although Mr. Jamerson is innocent, the tragedy that befell him was anything but.

His wrongful arrest, detention, prosecution, conviction, and imprisonment were the result of

egregious misconduct by the defendant law enforcement officers, forensic lab employees, City of Tulsa legal staff, and their supervisors.

6.      There was never a shred of evidence connecting Mr. Jamerson to the crimes for which he was convicted – the 1991 robbery of Ma Bell's restaurant and the rape of a teenage girl named Kayleen Davis (formerly Kayleen Dubbs).

7.      Ms. Davis – the sole witness to the assault – never independently identified Mr. Jamerson as her assailant. On the night of the crimes, multiple witnesses of the robbery told Tulsa Police Department officers that Davis's description of her assailant matched a man named Quinton Nails. Yet TPD never conducted any investigation of Nails. Instead, officers targeted Jamerson. They pulled a photograph of Jamerson, shared it with a fellow officer, and asked him to create a "composite drawing" of the suspect. They then used that drawing and their photo of Jamerson to convince Ms. Davis that he was the man who attacked her.

8.      According to Ms. Davis herself:

> After the drawing was completed, TPD officers told me they had identified the man who attacked me. They showed me a photograph of this man and told me he had previously worked at Ma Bell's. Officers stated the composite drawing was a "perfect match" of the photo they showed me. They told me I must have a "photographic memory," because the drawing was identical to the face in the photograph. They later told me the person in this photograph was named Jamerson.

9.      Ms. Davis has further stated under oath that before Mr. Jamerson's trial, TPD officers "told me Mr. Jamerson's semen had been found in my vagina during my rape exam, which conclusively confirmed their identification of Jamerson as my attacker." This was categorically false. In fact, DNA testing that could have identified Davis's assailant was not available at the time of Jamerson's trial in 1991.

10. Ms. Davis – who was only 16 years old, pregnant, and a rape victim – trusted the police and believed what they told her. She had no idea that this method of "identifying" a suspect was a terrible miscarriage of justice. At trial, she identified Jamerson as her assailant "based solely on the photograph TPD had shown [her] and their repeated insistence that they had conclusively identified him as [her] assailant."

11. Ms. Davis – the victim and the only witness of the rape – has stated emphatically that she never independently identified Jamerson as her assailant and she does not believe he was involved with the crime in any way:

> I would never have identified Jamerson as my attacker at any time if TPD and the District Attorney's Office had not lied to me about the rape kit evidence and repeatedly insisted that they had conclusively determined Jamerson was the man who attacked me. **_I do not believe Mr. Jamerson was my assailant or that he had any connection whatsoever to the attack._**

Ms. Davis further stated that she believes TPD **_"manipulated [her] when [she] was a 16-year-old pregnant rape victim, showing no genuine interest in getting justice for [her] or getting a rapist off the streets."_**

12. In another clear violation of Jamerson's constitutional rights, TPD did not disclose any of this information to Jamerson or his counsel prior to his trial. The suppression of this evidence caused the prosecutor to mislead the jury regarding how Jamerson had been identified as the suspect, falsely claiming Davis had independently identified him as her assailant.

13. Apart from these crucial misrepresentations, the prosecution's case rested on just one other piece of evidence: spermatozoa found in Ms. Davis's vagina during her rape exam. No other evidence even purportedly connected Jamerson to the crime. In fact, the only other physical evidence – including pubic hairs and head hairs found during Davis's rape exam – clearly excluded him. But at trial, a TPD chemist falsely testified that forensic testing showed that

spermatozoa found during Ms. Davis's rape exam could have come from Jamerson. The prosecutor relied on this false testimony to support her claim that Jamerson was in a "very narrow class" of people who could have been the assailant. Because forensic DNA identification was not yet available at the time of Jamerson's trial, his attorney could not rebut this claim.

14.     ***Just over three months after his arrest***, Jamerson was tried and convicted by a jury.  The trial judge sentenced him to thirty-four years in prison for the robbery and rape charges. On that basis, the court then accelerated Jamerson's sentence in a 1990 false impersonation case and sentenced him to an additional ten years on that conviction.

15.     As Jamerson sat in prison for decades, he repeatedly pleaded with City of Tulsa and County officials to produce the DNA evidence collected from the victim. For decades, these authorities falsely claimed this evidence had been destroyed. They said it under oath. They said it in Court filings. They said they were so certain it had been destroyed that they would not even look for it, stating "***we decline your request to inspect the Tulsa Police Department Laboratory and/or Property Room <u>to search for a piece of evidence that we are certain we have destroyed</u>***..."

16.     Despite the government's insistence that the evidence had been destroyed, Jamerson never lost hope. He remained vigilant. He was determined – at long last – to prove his innocence.

17.     In 2022, the Tulsa County District Court sanctioned a search of TPD's evidence facility by Jamerson's counsel. Prior to that search, TPD officers – acting at the direction and under the supervision of the District Attorney's Office – located the DNA evidence and notified officials and attorneys from the City of Tulsa and Tulsa County. ***Rather than notifying Jamerson and producing the evidence, they hid the evidence in a gun locker to prevent Jamerson's counsel from finding it during his search.***

18.     Nevertheless, Mr. Jamerson's counsel was able to locate the DNA evidence that the defendants had hidden for more than 30 years. It had been in TPD's possession the entire time. ***DNA testing of that evidence conclusively confirmed what Jamerson had always said – that he was not the contributor of the spermatozoa.*** In addition to implicating someone else in the attack on Ms. Davis, these test results eliminated the lone piece of physical evidence that purportedly connected Jamerson to the crime.

19.     In addition to the newly discovered DNA evidence, in January 2023, Jamerson's counsel obtained hundreds of pages of witness statements, police reports, forensic test results, and other documents related to Jamerson's case. Those documents included crucial exculpatory evidence that was never shared with Jamerson or his counsel before trial.

20.     Despite a complete absence of any evidence connecting him to the crimes committed at Ma Bell's, Henry Jamerson spent twenty-four years in prison. Following his release, he spent another 9 years as a convicted felon and a registered sex offender. The defendants named herein individually and collectively denied Mr. Jamerson a fair trial and/or spent decades covering up their misdeeds and denying Jamerson justice.

21.     Beyond compensating Mr. Jamerson for the decades that were stolen from him and his continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which defendants – acting under color of law, both independently and in concert – violated Mr. Jamerson's clearly established rights as guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the laws of the State of Oklahoma.

22.     Mr. Jamerson seeks damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys' fees, and such other and further relief as this court deems equitable and just.

## JURISDICTION AND VENUE

23.     Mr. Jamerson brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation of his rights, under color of law, as secured by the United States Constitution.

24.     This Court has federal question jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343.

25.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of Oklahoma, the judicial district in which the claims arose.

## JURY DEMAND

26.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Jamerson requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

27.     Plaintiff William Henry Jamerson is and was at all times relevant to this Complaint a citizen and resident of the State of Oklahoma. He currently resides in Tulsa, Oklahoma.

28.     Defendant City of Tulsa is a municipality that is a political subdivision of the State of Oklahoma, was the employer of multiple individual defendants named herein, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Tulsa Police Department ("TPD") and the Tulsa Police Department Forensic Laboratory.

29.     Defendant Steve Kunzweiler is the current District Attorney for Tulsa County, Oklahoma. Defendant Kunzweiler is sued purely in his official capacity. A claim against a state actor in his official capacity, such as DA Kunzweiler, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328

(10th Cir. 2010). *See also see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). As the elected District Attorney, Kunzweiler is, in essence, a governmental entity.

30.     Defendant Dennis Larsen was a police officer employed by TPD at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Larsen was acting within the scope of his employment and under color of State law. On information and belief, Defendant Larsen was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

31.     Defendant Debbie Daniels was a police officer employed by TPD at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Daniels was acting within the scope of her employment and under color of State law. On information and belief, Defendant Daniels was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

32.     Defendant John Hunter was a police officer employed by TPD at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Hunter was acting within the scope of his employment and under color of State law. On information and belief, Defendant Hunter was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

33.     Defendant David Witt was a police officer employed by TPD at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Witt was acting within the scope of his employment and under color of State law. On information and belief, Defendant Witt was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

34.     Defendant Kathleen Whitehead was a police officer employed by TPD at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Whitehead

was acting within the scope of her employment and under color of State law. On information and belief, Defendant Whitehead was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

35.     Defendant Micheal Burgess was a police officer employed by TPD at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Burgess was acting within the scope of her employment and under color of State law. On information and belief, Defendant Burgess was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

36.     Defendant James Slay was a police officer employed by TPD at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Slay was acting within the scope of his employment and under color of State law. On information and belief, Defendant Slay was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

37.     Defendant Jon Cozad was a police officer employed by TPD at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Cozad was acting within the scope of his employment and under color of State law. On information and belief, Defendant Cozad was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

38.     Defendant Tara Brians was employed by TPD as the Director of its forensic laboratory at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Brians was acting within the scope of her employment and under color of State law. On information and belief, Defendant Brians was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

39.     Defendant Ann Morris was employed by TPD as a forensic chemist at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Morris was

acting within the scope of her employment and under color of State law. On information and belief, Defendant Morris was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

40.     Defendant Becky Johnson was an assistant City attorney employed by the City of Tulsa at all times relevant to her conduct related to this Complaint. At all pertinent times, Defendant Johnson was acting within the scope of her employment and under color of State law. On information and belief, Defendant Johnson was a resident of Tulsa, Oklahoma at the time of her acts and omissions described herein.

41.     Defendant Hayes Martin was an assistant City attorney employed by the City of Tulsa at all times relevant to his conduct related to this Complaint. At all pertinent times, Defendant Martin was acting within the scope of his employment and under color of State law. On information and belief, Defendant Martin was a resident of Tulsa, Oklahoma at the time of his acts and omissions described herein.

## **FACTS**

42.     On the night of May 24, 1991, Glenda Dubbs (now "Davis") and her boyfriend, Jimmy Hunt ("Hunt"), were both working shifts at Ma Bell's restaurant in Tulsa.  Ms. Davis was let off early from work that night.  So she sat in her parked car behind Ma Bell's and waited for Hunt to get off work.

43.     According to multiple Ma Bell's employees who were working that night, at approximately 10:30 PM a black man – whose face was covered by a bandana and a hat – entered the restaurant and brandished a gun. The man ordered employees to give him money from the register and then left.

44. After the gunman left Ma Bell's, Davis re-entered the restaurant. Her boyfriend, Hunt, then called the police and reported a robbery.

45. TPD officers arrived at the scene and interviewed multiple witnesses, including Davis. At that time, Davis reported that during the robbery a second man had removed her from her car and sexually assaulted her.

46. Davis wrote a witness statement describing the attack. The statement did not identify or describe her assailant, other than stating that he was black.

47. Police took Davis to the University of Oklahoma Medical Clinic for a rape exam. Clinic personnel collected evidence from Davis, including a vial of vaginal washing, external genitalia swabs and smears, cervical mucosa swabs and smears, anal swabs and smears, and underwear and other items of clothing.

48. In a written report, TPD Officer M.P. Hanley wrote that he interviewed employees who were present at the robbery and "some of them said that ***the description of the rapist matches that of a former employee with the first name of '<u>Quinton</u>.'***" Officer Hanley's written report further indicates that he "was approached by ***Jimmy Hunt who told me that based on his girlfriend's description of the subject who raped her he said it matches Quinton.***"

49. Hunt also told Officer Hanley that the acting supervisor at the time of the robbery – who identified himself as Kenneth Hopkins, but whose real name was Kenneth Duncan – was acting strangely on the night of the robbery:

> I asked him if Kenneth appeared scared or surprised by the robbery and he said that he sounded like he was scared. He also told me that the flood lights on the rear of the bldg. had not been turned on tonight. I asked him who should have turned them on and he said Kenneth should have or told someone else to turn them on.

The robber had entered Ma Bell's through the unlit back door.

50.     ***Neither Jamerson nor his counsel were ever informed that multiple witnesses had stated that: (1) the description of the rapist matched a person named Quinton; or (2) Kenneth "Hopkins" was acting strangely on the night of the robbery and had failed to turn on the flood lights at the rear of the building, where the robber entered.*** Moreover, none of this information was included in the probable cause affidavit submitted by TPD in Jamerson's case.

51.     Davis's witness statement and descriptions of her statements by TPD and the District Attorney's office all reflect noticeably different accounts of the assault. ***None of these statements or records were ever shared with Jamerson or his counsel.***

52.     TPD Detective John Hunter's "investigation" of the robbery consisted of nothing more than making a single phone call and pulling two photos from TPD's files. In a written report, Hunter stated that John Reed – a manager at Ma Bell's who was not present on the night of the robbery – provided him the names of three current or former Ma Bell's employees who were black: Quinton Nails, William Henry Jamerson, and Eugene Allen. Hunter reported that after Reed supplied these names, he "obtained the latest Master File photo of Jamerson and Allen." He did not pull a photograph of Quinton.

53.     ***Although multiple witnesses had stated the description of the rapist matched Quinton, TPD records reflect no effort to interview or investigate Quinton.*** Indeed, Detective Hunter's own report gives no indication that he ever spoke to a single witness of the robbery, that he ever spoke to Quinton (or Allen or Jamerson), or that he undertook any investigation whatsoever. Instead, Detective Hunter and Debbie Daniels, a detective in the Sex Crimes Unit who was investigating the rape case, focused solely on convicting Jamerson of the crime.

54. Although Detective Hunter's own report shows he had undertaken no investigation at all – and had not even spoken to the individual named by multiple witnesses as the likely assailant – he wrote that by July 1991 "[t]he investigation of the robbery bogged down as I had no witnesses who could identify the robbery suspect..." Hunter wrote that he then gave "all of [his] information" to Detective Daniels.

55. After Detective Hunter gave Detective Daniels the photograph of Jamerson, Daniels arranged for another TPD officer, David Witt, to create a purported "composite drawing of the suspect." Witt was not a forensic artist. He was not even in the Sex Crimes Unit. He was a detective assigned to a gang task force. On information and belief, Witt created the "composite drawing" after seeing the photograph of Jamerson and knowing that he was the sole "suspect" being pursued by TPD.

56. According to Detective Hunter's report, when Witt was finished creating the drawing, Hunter looked at it and "noticed the resemblance of that composite to be [sic] a standard police mug shot of William Henry Jamerson" – the very same photo Hunter had given to Detective Daniels before she arranged the composite drawing. The records indicate Hunter then shared the drawing and the photograph of Jamerson with Detective Daniels, who agreed there was a "remarkable resemblance."

57. ***TPD officers subsequently informed Davis that, based on Detective Witt's drawing, <u>they</u> had identified Jamerson as her assailant.*** As Ms. Davis describes in her affidavit:

> After the drawing was completed, TPD officers told me they had identified the man who attacked me. They showed me a photograph of this man and told me he had previously worked at Ma Bell's. Officers stated the composite drawing was a "perfect match" of the photo they showed me. They told me I must have a "photographic memory," because the drawing was identical to the face in the photograph. They later told me the person in this photograph was named Jamerson.

TPD never disclosed to the District Attorney's Office, to Jamerson, or to Jamerson's counsel that TPD – <u>not</u> Davis – had identified Jamerson as her assailant.

58.     In a Supplemental Offense Report, Detective Daniels claimed TPD conducted a photo lineup on July 25, 1991. That alleged lineup was conducted by Det. Daniels herself, rather than a neutral blind administrator. Daniels included only four other photos in the purported lineup. None of the individuals included in the purported lineup resembled Ms. Davis's description of her assailant.

59.     Ms. Davis had described her assailant as 5'7 and 125-130 lbs.  Jamerson is 5'10 and at that time weighed 160 pounds. Although Jamerson was three inches taller and at least 30 pounds heavier than Davis's description, each of the other individuals in the alleged photo lineup was even larger – and therefore even less like Ms. Davis's description of her assailant. At 6'3, Andrew Lee Ross was a full eight inches taller than Davis's description and five inches taller than Jamerson. At 6'1, Edward Eugene Thompson and Luke Albert Mason were half a foot taller than Davis's description and four inches taller than Jamerson. Of the five men TPD allegedly presented to Davis in the photo lineup, only one, Lavon Williams, was anywhere near Jamerson's size – and even he was still an inch taller than Jamerson and four inches taller than Davis's description of her assailant.

60.     Daniels falsely claimed "Glenda Dubbs [Davis] viewed the above lineup and identified photo #3, that of William Henry Jamerson, as being the same person that put his penis and fingers inside her vagina…" Although Daniels' report stated that "[t]he above lineup will be contained in this detective's file," ***in fact only one person's picture appears in the files: Henry Jamerson***.

61.     Detective Daniels also claimed she taped an interview with Ms. Davis on the same day as the alleged "lineup." Just like that purported "lineup," however, **the recording of TPD's interview with Davis – the victim and lone witness of the rape – is also inexplicably "missing" from the files.**

62.     Ms. Davis's sworn statements directly refute Detective Daniels' account. Ms. Davis states **"I never independently identified Jamerson as the man who attacked me, nor did I ever independently pick his photo out of a lineup.** Instead, TPD officers repeatedly showed me a photo of Mr. Jamerson and told me they had conclusively identified him as my assailant." In addition, Davis testified at trial that when she spoke to Detective Daniels on the day of the alleged lineup, "I told her that **I wasn't sure**, and **I wasn't going to go blame anybody.**" Davis further stated **"I wasn't for sure, because I just caught a glimpse of him."** Yet because the recording of Daniels' interview of Davis mysteriously disappeared – along with the alleged photo lineup and (for thirty years) the rape kit evidence – these exculpatory statements were never shared with Jamerson or his counsel.

63.     Although TPD identified Jamerson as Davis's assailant on July 18, 1991, TPD took no action to apprehend this alleged rapist for nearly a month. On August 16, the Tulsa County District Court issued a warrant for Jamerson's arrest in the rape case – without a probable cause affidavit on file.

64.     On August 19, the District Attorney's Office filed an Application to Accelerate Judgement and Sentence in a previous case – a 1990 False Impersonation conviction Jamerson had incurred for presenting his brother's driver's license as his own. The application alleged Jamerson had violated the terms of his parole in that case by assaulting Davis, as alleged in another criminal case that had not yet been filed – a case referred to in the application as "CF-

91-_____." That same day, the Court issued a bench warrant for Jamerson's arrest in connection with the application to accelerate.

65.     On August 26, 1991, TPD arrested Jamerson. That same day, the Tulsa County District Court held a hearing in the 1990 False Impersonation case. Jamerson was denied any meaningful opportunity to defend himself at the hearing. He was forced to appear without counsel and had only learned of the application that same day. Nevertheless, the Court found him guilty of non-payment of fees and costs and sentenced him to 131 days in the Tulsa County Jail.

66.     Even with their rape suspect confined in jail, **at no time did TPD interview Jamerson.** They never asked him about his whereabouts on the night of May 24, 1991, or his possible involvement with the robbery. Prior to Jamerson's arrest, Detective Hunter – who was investigating the robbery – claimed that "[t]he investigation of the robbery bogged down as I had no witnesses who could identify the robbery suspect…" Yet after TPD identified Jamerson as the alleged rapist and took him into custody, they did not even ask him to identify his alleged co-conspirator – the masked individual who robbed Ma Bell's at gunpoint. Following Jamerson's arrest, the record shows that TPD made no attempt whatsoever to identify the robber.

67.     Although TPD had the physical evidence from the crime scene and from Davis's rape kit, they did not submit it to the TPD Forensic Laboratory for analysis – or take blood or saliva samples from Jamerson – until months **after** his arrest. In fact, although Jamerson was in custody at the Tulsa County Jail as of August 26, **TPD did not take his blood and saliva until October 9, 1991 – more than six weeks after his arrest, <u>a month after his preliminary hearing</u>, and just eight weeks before his trial.**

68.     On August 27 – eleven days **_after_** the Court issued a warrant for Jamerson's arrest in the rape case and a day after his arrest – Detective Daniels filed with the District Court

16

a probable cause affidavit seeking a warrant for Jamerson's arrest in the rape case. Daniels' affidavit did not disclose that: (1) multiple witnesses had identified a different individual as Davis's likely assailant; (2) Kenneth "Hopkins" was acting strangely on the night of the robbery and had failed to turn on the flood lights at the rear of the building, where the robber entered; (3) Davis never independently identified Jamerson as her assailant; (4) TPD officers identified Jamerson as the suspect by pulling a photo of him, creating a non-forensic drawing of the suspect, and then claiming the drawing resembled their photo of Jamerson; (5) TPD had not subjected evidence collected from the crime scene and Davis's rape kit to forensic analysis; and (6) TPD had never interviewed Jamerson.

69.     On September 10, 1991 – just two weeks after Jamerson's arrest – the District Court held a preliminary hearing in his case. As Ms. Davis recounts in her sworn statement, ADA Vicki Sousa instructed her to identify Jamerson as her assailant at the preliminary hearing:

> Ms. Sousa told me that during the preliminary hearing my attacker would be in the courtroom in a jail uniform. She instructed that, when asked, I should identify him as the person who attacked me. At the hearing, Mr. Jamerson was in the courtroom in an orange jail uniform. He was the only prisoner in the room. ***I recognized Mr. Jamerson from the photograph of the man who police said had attacked me. Based on Ms. Sousa's instructions and the police's identification of Mr. Jamerson as my attacker, I identified him as my assailant at the hearing.***

70.     On October 1, 1991, the TPD Forensic Laboratory tested the hair and clothing recovered from Ma Bell's and from Davis's sexual assault examination. The State's own records show the prosecution scoured the physical evidence to try to find hairs that could tie Jamerson to the crime, but the only evidence they found excluded Jamerson as the assailant. Handwritten notes from TPD's Lab Case File state that "Vicki Sousa called. . . She said that she needs to know if there are any Negroid hairs in order to obtain known samples from the suspect!" The following day, the notes indicate ***"No Negroid hairs so far!"***

71.     TPD never found the "Negroid" hairs they were looking for. They did, however, find numerous "Caucasoid" pubic and head hairs on the clothes TPD recovered from Davis on the night of the attack.

72.     In a written report dated November 19, 1991, Detective Daniels claimed that more than a month earlier she had "held a taped interview" with an acquaintance of Jamerson's named Antonio Johnson. The report claimed Johnson "stated that Jamerson told him that he (Jamerson) had told his attorney that he (Antonio) had come over to his (Jamerson's) house the night that something was supposed to have happened, which was related to the charges that were being charged against him (Jamerson)." While this statement is virtually unintelligible, the State claimed it showed Jamerson sought to use Mr. Johnson as a false "would-be alibi witness" for him. In furtherance of its ongoing efforts to deny Jamerson justice, ***the District Attorney's Office later falsely claimed – in a pleading – that "has-been defense witness Antonio Johnson . . . reported to Detective Daniels that Jamerson had tried to recruit him as another alibi witness for the night of the crime…"***

73.     Detective Daniels' report says nothing of the sort. Moreover, in a sworn statement Mr. Johnson himself states "[t]he State's claim is false. At no time did Mr. Jamerson ask me to serve as an alibi witness for him or to make any false statements on his behalf." Notably – ***just like the alleged photo lineup and the recorded interview with Ms. Davis – TPD's recording of Mr. Johnson's interview is conveniently "missing."***

74.     On November 14, 1991 – ***nearly three months after Jamerson's arrest and just 20 days before his trial*** – the TPD Forensic Laboratory reported the results of its serology analysis on the vaginal washing and the swabs and smears in the sexual assault kit. The laboratory also tested blood taken from Davis, Hunt, and Jamerson to determine their blood types and "secretor" status – meaning whether their blood types could be determined from body

fluids like their saliva, semen, or vaginal fluids. The tests detected spermatozoa in the samples taken from Davis's vagina, anus, and underwear. The tests detected only blood type A in these samples. ***The tests also revealed that Hunt – Davis's boyfriend and the father of her child – was blood type A. Jamerson is blood type O.***

75.     The samples from the sexual assault kit were never subjected to autosomal short-tandem-repeat (STR) DNA analysis because STR DNA testing was not available at the time of trial and did not become generally accepted and routinely used in the scientific community until the late 1990s and early 2000s. Nevertheless, ***prior to Jamerson's trial, TPD officers falsely told Ms. Davis that "Mr. Jamerson's semen had been found in [her] vagina during [her] rape exam, which conclusively confirmed their identification of Jamerson as [her] attacker."***

### JAMERSON'S TRIAL

76.     Jamerson pled not guilty and went to trial. ***His trial began on December 3, 1991 – just over three months after his arrest.*** The prosecution's case at trial rested on just two pieces of "evidence": (1) Davis's testimony identifying Jamerson as her assailant, and (2) a serology test of spermatozoa found in Ms. Davis's vagina during her rape exam.

#### A. Davis's Alleged Identification of Jamerson

77.     Based on the false and incomplete evidence TPD produced to ADA Sousa, Ms. Sousa's opening statement misrepresented to the jury the sequence of events that led to Jamerson's identification as the suspect. In Ms. Sousa's telling, Detective Hunter "was given a copy of the composite drawing and recognized the person in that drawing," and ***then*** he "provided Detective Debbie Daniels with a photo of that person so that she could conduct a photo lineup." TPD's own records show otherwise. Detective Hunter's report shows he ***first***

pulled Jamerson's photo and shared it with Detective Daniels, who ***then*** arranged for a composite drawing of the suspect to be made. Having procured the composite drawing ***after*** receiving Jamerson's photo, Detective Hunter and Daniels dubiously found the resemblance between the two images "remarkable." Yet because Detective Hunter's report was not provided to Jamerson or his counsel prior to trial, counsel had no evidence to contradict Ms. Sousa's false account.

78.     At trial, Davis testified that on the night of the robbery it was "very dark" in the parking lot where she was attacked. Although Davis testified at trial that she had previously met Jamerson several months before the attack, prior to being told by TPD officers that they had identified Jamerson as her assailant, Davis had given no indication that she had previously met her assailant. In fact, Officer Hanley's report stated unequivocally that "Kayleen [Davis] does not know any of these subjects." In recent statements, Ms. Davis again affirmed that she never seen Jamerson before TPD showed her a photo of him and told her he was the man who attacked her.

79.     In addition, Davis testified at trial that Jamerson's hairline was not the same as the hairline depicted in the "composite drawing."

> Q: Is that the hairline of the man who raped you in that picture [the composite drawing]?
>
> A: Yes.
>
> Q: You're absolutely sure of that?
>
> A: Yes.
>
> Q: Would you look at the defendant? Would you look at him right now? Is that the hairline that that man has on his head today?
>
> A: No.

80. Despite her testimony that it was very dark during the assault, her previous insistence that she did not know her assailant, and her admission that the composite drawing did not resemble Jamerson, Davis nevertheless identified Jamerson as her assailant at trial. In her sworn statement, Ms. Davis explains that she only did so because TPD had gone to great lengths to convince her – a scared, 16-year-old rape victim – that they had conclusively determined Jamerson was the man who had assaulted her:

> During my testimony, I identified Mr. Jamerson in the courtroom, again based solely on the photograph TPD had shown me and their repeated insistence that they had conclusively identified him as my assailant. Because TPD had repeatedly told me they were certain Jamerson was the man who raped me, and because they had told me his semen was found in my vagina during my rape exam, I testified that I had no doubt that Mr. Jamerson was my attacker.

81. Jamerson's counsel was unable to effectively challenge Ms. Davis's identification testimony because TPD had not disclosed that: (1) TPD officers – not Davis – had identified Jamerson as the assailant, (2) TPD officers had repeatedly shown Davis a photo of Jamerson and stated they were certain he had raped her, and (3) TPD officers had falsely told Davis that Jamerson's semen had been found in her vagina during her rape exam.

### B. Forensic Testing of Davis's Rape Kit Exam

82. Apart from Davis's alleged identification, the ***only*** other evidence introduced against Jamerson at trial were the results of tests performed by the TPD Forensic Laboratory on evidence collected from Davis's sexual assault kit. The prosecution called Ann Morris, a forensic chemist at the laboratory, to testify about those results.

83. Morris testified that the tests of Davis's blood showed she was blood type A and a "secretor," meaning a person whose blood type can be detected in their body fluids, such as saliva, semen, or vaginal fluids. She testified that tests of Jamerson's blood showed he was blood

type O and a "non-secretor," meaning his blood type cannot be detected in body fluids other than blood.

84. Morris testified that spermatozoa was detected in the samples taken from Davis's vagina, anus, and underwear. She further testified that when she subjected those samples to antigen testing, she only detected antigen A activity – meaning only blood type A was detected in the samples. Morris asserted this result was consistent with the spermatozoa coming from Jamerson, because Jamerson was a "non-secretor":

> Q: Based upon your experience and your training, your expertise, and these tests that you performed on these samples, if the defendant's fluids were mixed with the victim's fluids, what would you get?
>
> A: On what particular -- what are you referring to?
>
> Q: Well, **say, for example, the defendant ejaculated when he had sexual intercourse with the victim; okay? So there you have sperm from the defendant, who is type 0 nonsecretor; you have vaginal fluid from the victim, who is type A secreter. With that mixture, what would you get when you tested it?**
>
> A: On the secreter tests? What would I get on the secreter tests? Is that the question?
>
> Q: Yes, the antigen activity. What would your results be? What antigen activity?
>
> A: With a nonsecretor – a mixture of a nonsecretor and a secreter, you would detect the blood group of the secreter.
>
> **Q: So in this case, because the victim is a type A secreter and the defendant is a nonsecretor, the result that you – the antigen results that you would get would be antigen type A?**
>
> **A: Yes. If the mixture of the fluid involved was a nonsecretor and a secreter type A, I would detect antigen A activity.**
>
> Q: If the defendant – take that same scenario that we just went over. If the defendant was type 0 secreter rather than type 0 nonsecretor, what would you get in your antigen activity?

A: If you have a mixture of a type A secreter and a type 0 secreter, you would detect antigen A and H activity.

Q: A and H?

A: Yes. H – the antigen H indicates a type 0 blood type.

*Q: And what you testified to is your results of the test you ran with antigen A activity, is what you got?*

*A: Yes, on the items that I testified to, antigen A activity was detected.*

Q: Did you ever get antigen A/H activity?

A: No, only antigen A activity was detected.

*Q: I might have already asked you this. You say 80 percent of the population are secretors?*

*A: Yes.*

*Q: So then does that mean 20 percent of the population are nonsecretors?*

*A: Right.*

85.    In closing arguments, the State argued **Morris's testimony "put [Jamerson] in a very narrow class of people. She told you that only 20 percent of the population is a nonsecretor. He's a nonsecretor."**

86.    All of this was false. In truth, Mr. Jamerson is a secretor. Accordingly, if the spermatozoa had come from him, his blood type would have been detected in serology testing. In fact, since testing that showed only blood type A in the vaginal wash, those test results conclusively excluded Jamerson as the source of the spermatozoa found on Ms. Davis after the assault. Yet the State relied on Morris's false testimony to argue that Jamerson was in a "narrow class" of people who could have been the assailant.

87.     Presented with a manipulated eye-witness identification by the victim and false forensic testing results, on December 4, 1991, a Tulsa County jury convicted Jamerson of first-degree rape, rape by instrumentation, and robbery with a firearm. The trial judge sentenced him to 34 years in prison on the rape and robbery charges. Based solely on that conviction, the Court determined Jamerson had violated the terms of his probation on the false impersonation conviction and sentenced him to an additional 10 years, to run consecutively with the other sentence.  In total, Jamerson was sentenced to 44 years in prison.

## POST-CONVICTION PROCEEDINGS

### A. For decades after Jamerson's conviction, the Defendants concealed and withheld the DNA evidence, and falsely claimed it had been destroyed.

88.     Jamerson unsuccessfully challenged his conviction for 32 years. *For more than two decades, he repeatedly requested the evidence collected in his case, including DNA evidence from the sexual assault kit.  Each time he was told – falsely – that this evidence had been destroyed.*

89.     As soon as TPD achieved its aim of convicting Jamerson, a thirty-year conspiracy to hide TPD's malfeasance and keep Jamerson in prison began. After the conclusion of Jamerson's trial, TPD officers gave Sousa the recording of Detective Daniels' interview of Ms. Davis. Sousa never returned that recording to TPD. It has been missing ever since.

90.     Sousa also never returned items she had received from TPD prior to trial. TPD had given Sousa the rape kit evidence, items of Ms. Davis's clothing collected during her rape exam, and blood and saliva samples taken from Mr. Jamerson. Five months later, Sousa returned the Jamerson samples to evidence. But she never returned the rape kit or the clothes taken during the rape exam.

91.     On May 19, 1997, TPD forensic lab director Carla Noziglia returned numerous slides to the property room that had been lying around in piles at the laboratory. That evidence included slides containing DNA from the rape kit in Mr. Jamerson's criminal trial. Instead of properly logging this evidence and documenting its location, TPD property room personnel stored and documented this evidence in ways that made it easy to hide it and/or to claim it was lost or destroyed.

92.     First, although the slides were created from the rape kit, TPD personnel did not record the evidence under property receipt AA9462, which contained the rape kit evidence. Instead, they recorded the slides under property receipt AA9460, which contained a dome light from Ms. Davis's car and blood and saliva taken from her boyfriend. As a result, any time Jamerson or his counsel sought evidence from the rape kit, TPD and the City of Tulsa would point to AA9462 and claim the evidence did not exist.

93.     Second, TPD personnel recorded their receipt of these slides only on paper – not on TPD's electronic TRACIS system. As a result, if TPD personnel wanted to locate this evidence, they could find it by simply looking at the original, paper property receipts. But when Jamerson sought the evidence, TPD could simply provide the TRACIS information and these slides would not be listed there. This allowed TPD, the City's attorneys, and the District Attorney's Office to falsely claim the evidence did not exist.

94.     As forensic DNA testing first became available, in 2001 the Oklahoma legislature enacted a law that authorized the Oklahoma Indigent Defense System (OIDS) "to provide DNA testing for inmates whose convictions were based on forensic evidence before DNA testing was possible." ***Out of thousands of criminal convictions, OIDS expressly identified Jamerson's case as one of just <u>10</u> cases in which "new DNA testing techniques might exonerate the inmates."*** OIDS asked TPD to preserve and secure the evidence from

these 10 cases. In response, TPD Chief Ron Palmer agreed to preserve all biological evidence related to these ten cases, including Jamerson's, and to research the evidence from each of these cases.

95.     Instead, however, on May 8, 2001, TPD laboratory director Mark Boese wrote a memo in which he falsely claimed that TPD had researched the evidence in Jamerson's case and that the evidence had been "disposed of," allegedly pursuant to a court order. In truth, there was no court order for the disposal of this evidence, and the evidence had not been destroyed.

96.     Nevertheless, Boese's misrepresentation was effective in preventing OIDS from assisting Jamerson. On July 5, 2001, Jamerson received a letter from Kathleen Smith, an attorney with the DNA Forensic Testing Program at OIDS. Relying on the false information she had received from TPD, Ms. Smith's letter stated that ***the Tulsa Police Department destroyed whatever evidence they had in their possession.*** Ms. Smith indicated "[w]e have now exhausted all of our known options for locating evidence in your case. Since a requirement for acceptance into the DNA Forensic Testing Program is the existence and availability of testable evidence, ***we must now close your file***."

97.     Undeterred, on March 1, 2002, Jamerson wrote a letter from prison to Tulsa County Clerk Sally Howe-Smith in which he pleaded for help locating the DNA evidence from his case:

> Ms. Smith[,] Good morning.  My name is William Henry Jamerson.  I'm in the custody at Dick Conner Correctional Center. . .
>
> The purpose of me writing you this letter to you because I receive a letter from Oklahoma Indigent Defense System, DNA Testing Forensic Testing Program that my evidence has been destroy[ed] and my evidence couldn't be tested.
>
> Ms. Smith, this is my freedom and life is on the line.  This evidence can prove that I'm not the man who commit[ted] this crime I was charged with by the District Attorney Offices.  I took[] a DNA test to prove my innocent.  Ms. Smith, [if] this wasn't important to me I would not be sending this letter to you.  Let me ask you

this question. Your son or daughter get lock-up for a crime that you know [n]either of them commit[ed] and get sen[t] to prison. You would be in pain. Just take a second in my mother position what she [is] going through. Ms. Smith, I promise to you that I'm not the man who rape[d] that young lady, nor harm[ed] her. I just want to prove that. My mother can't afford a[n] attorney to look[] into my case, that why I'm turn[ing] to you for your help. Would you please check and see can you found my evidence so it can be tested case number CF 91-3429. I just want to see my mother happy. She all I have in my life, and she mean the world to me. And I hope that you can make [this] wish come true. I appreciate whatever you can do to help me.

Jamerson received no response.

98.     On December 15, 2014, Jamerson again reached out to OIDS seeking their help in locating the evidence. In response, OIDS investigator Kim Marks − relying on TPD's representations to her − again told Jamerson that TPD had searched for the evidence and determined it had been "disposed of."

99.     Jamerson sat in prison for 24 years. On May 1, 2015, he was released early for good behavior. Upon his release, he was required by law to register as a sex offender until 2025.

100.     Following his release, Jamerson's counsel renewed Jamerson's requests to TPD to search for the evidence from his case so that it could be subjected to DNA testing. The Tulsa County District Attorney's office assisted TPD in the investigation and provided administrative oversight of that effort.

101.     On March 9, 2016, Jamerson's counsel sent TPD Chief Chuck Jordan a demand for "all documents, tangible things and electronically stored information potentially relevant to Mr. Jamerson," including without limitation "DNA samples, DNA test kits, [and] rape kits." The letter specifically demanded all items "stored in evidence under property receipt AA 9462 or ***any other property receipts stored***" in connection with Mr. Jamerson's case.

102.     Chief Jordan forwarded counsel's request to TPD Records Custodian Karen Tipler. On March 14, 2016, Cpt. Tipler emailed various TPD personnel − including Defendant

Brians, the director of the forensic laboratory – stating **_"I believe the items listed on the receipt may still be in the property room."_**

103. On March 22, 2016, Assistant City Attorney Benedict Shelton emailed Cpt. Tipler, Defendant Brians, and other TPD personnel and informed them that "[t]he Property Receipts numbers are AA9460 and AA9462."

104. Rather than providing the case file for both property receipts, however, Defendant Brians provided only documents related to AA9462. She provided no information regarding AA9460 – the property receipt that held DNA evidence from Ms. Davis's rape exam.

105. On June 12, 2018, Jamerson's attorney sent a letter to the TPD Evidence and Property Room requesting their assistance in locating the physical evidence associated with Jamerson's case, including the sexual assault kit. Continuing the pattern of misinformation, in a letter dated August 31, 2018, **_Senior Assistant City Attorney Becky Johnson falsely claimed the evidence from Jamerson's criminal case had been destroyed._**

106. Jamerson's counsel wrote Johnson another letter on September 21, 2018, along with an affidavit from Valerie Fuller, an expert retained by Jamerson who was formerly the head of the DNA testing unit at the TPD Forensic Laboratory. Fuller expressed doubt that the sexual assault kit from Jamerson's criminal case had been destroyed and requested access to the chain-of-custody and analysis records related to the evidence from the case.

107. On October 17, 2018, the City Attorney's Office doubled down on the false narrative. Johnson responded that the City refused to even look for the evidence, writing "[p]lease be advised that **_we decline your request to inspect the Tulsa Police Department Laboratory and/or Property Room_** _to search for a piece of evidence that we are certain we have destroyed_**, to wit, the sexual assault kit from property receipt AA9462."

28

108.     On July 17, 2019, Jamerson's counsel submitted a Motion Requesting Retesting of DNA Evidence in the Tulsa County District Court. The motion sought the evidence from the sexual assault kit from Davis's rape exam on the night of May 24, 1991.

109.     Rather than looking for the evidence, District Attorney Steve Kunzweiler and Assistant District Attorney Randall Young opposed Jamerson's motion and repeated TPD's false claims that the evidence had been destroyed. In its response, **District Attorney Kunzweiler and ADA Young falsely represented to the Court that "the items requested for testing no longer exist."** Kunzweiler and Young further assured the Court that **"there is no reason to doubt the City of Tulsa** [sic] **diligence in failing to locate Petitioner's evidence."** Again and again, the District Attorney's Office falsely insisted the evidence Jamerson sought did not exist.

110.     While providing administrative oversight of the response to counsel's requests for the sexual assault kit evidence, Assistant District Attorney Randall Young purportedly directed Sgt. Whitehead at TPD Property to "conduct a thorough search" like the one previously requested by Fuller. Sgt. Whitehead reported to Young that she had completed the search and determined that **"TPD Labs do not have the sexual assault kit in this case."** On July 21, 2020, Young repeated that false claim to Jamerson's counsel.

111.     On August 28, 2020, Mr. Young again insisted that TPD and the District Attorney's Office had conducted a thorough search. In a sworn statement, Mr. Young represented to the Court that "[t]he undersigned has worked closely with counsel, the City of Tulsa's counsel, and Tulsa Police Department's Property Division to conduct an accurate inventory of the evidence as required by statute."

112.     On November 4, 2020, the Tulsa County District Court held a hearing on Jamerson's motion seeking the DNA evidence. At that hearing, Defendant Whitehead, a

supervisor at the TPD property room, falsely testified under oath that she had conducted a diligent effort "to locate any possible evidence" from Jamerson's criminal case. Although Lt. Whitehead "testified that she has looked through everything that she can possibly think of," she claimed she could not locate the evidence – the same evidence Jamerson's counsel was later able to locate the first time he ever set foot in the TPD property room.

113.    At that same hearing, Assistant District Attorney Jimmy Dunn sought to persuade the Court not to allow Jamerson's counsel to conduct his own search of TPD's property room. He repeatedly insisted the Court should simply accept TPD's claims that they had conducted an exhaustive search for the evidence:

> I mean, we have had Officer Whitehead, who testified that she has looked through everything that she possibly can think of. . .  If TPD's word is not good enough, then in every single one of these cases, the people are going to say, "I want to go look for myself.  I don't trust you." . . . I don't know what else can be done. If their word isn't going to be good enough, when will it ever be?

114.    At that same hearing, ADA Dunn dismissed another case from the same time period in which TPD and the City of Tulsa had similarly spent a decade falsely claiming DNA evidence had been destroyed. Dunn told the Court that was merely "a fluke."

115.    If the Court had trusted ADA Dunn, Lt. Whitehead, and TPD, the evidence that proved Jamerson's innocence would still be hidden in TPD's property room and Jamerson would still be a convicted felon. Instead, the Court issued a minute order stating "COURT ORDERS STATE TO PRODUCE CHAIN OF COMMAND AND TRACIS TO PETITIONER WITHIN 15 DAYS."

116.    Rather than sending all property receipts from Jamerson's case, however, ADA Dunn provided only Property Receipt #AA9462. He did not produce Property Receipt #AA9460, which contained the evidence that would eventually prove Jamerson's innocence.

117. On February 10, 2021, Mr. Dunn represented that he had "spoken with the Court Clerk's Office supervisor out at the warehouse and he is look [sic] to see if he can locate any of the evidence that may have been introduced in Mr. Jamerson's case." Neither Dunn nor his successor ever reported the results of that alleged search.

118. On May 13, 2022, Assistant District Attorney Matt Kehoe again endorsed TPD's false claim that the sexual assault kit evidence had been destroyed. Kehoe informed Jamerson's counsel that in the course of his investigation into the sexual assault kit evidence, the TPD Property Room had reported to him that "***the property, despite being listed in their records system, was not located at any of TPD's locations where property is stored.***" Kehoe stated that "[a]t this point I have exhausted all my resources and possible information as to the location of this item, and have not been able to locate it or adequately establish a chain of custody."

**B. Even with the "missing" DNA evidence in their hands, Defendants continued to hide that evidence from Jamerson and his counsel.**

119. On July 27, 2022, the Tulsa County District Court endorsed a request by Jamerson's counsel to allow him to personally conduct a search of the TPD property room, under the supervision of the Tulsa County District Attorney's Office, TPD, and TPD's legal counsel.

120. In anticipation of that search, TPD Officer Slay was tasked with securing evidence associated with Mr. Jamerson's criminal case. Slay determined property receipt AA9460 contained relevant evidence, including item #6, which consisted of lab slides. At Slay's direction, retired TPD Officer Compton, who was serving as a volunteer, located the evidence at TPD's Amos T. Hall facility and brought it to TPD's main property room.

121.     Officer Slay showed the slides to the TPD Property Room Custodian, Lt. Burgess, and identified them as evidence that Mr. Jamerson's counsel had requested. Lt. Burgess then informed City of Tulsa attorneys Hayes Martin and Kristina Gray, TPD Deputy Chief Matt McCord, TPD Captain Dennis Larsen, TPD Captain Eric Nelson, and Assistant District Attorney Matt Kehoe, of her discovery and asked whether this evidence was what Mr. Jamerson was seeking.

122.     In response, Hayes Martin provided Mr. Jamerson's motion requesting an inventory of ***all*** evidence related to the case, including the custodian of such evidence, the affidavit of Valerie Fuller requesting all related forensic evidence and documentation (including chain-of-custody documents), and a June 12, 2018 letter from Jamerson's attorney stating that they had previously been informed that the evidence under property receipt AA9460 had been destroyed.

123.     Despite multiple requests for ***all*** forensic evidence related to this wrongful conviction over more than twenty-one years, Lt. Burgess did not disclose the discovery of this evidence to Mr. Jamerson's counsel. Instead, on August 1, 2022, ***Burgess ordered Slay to conceal the evidence in a gun vault.*** Slay agreed and hid the evidence pursuant to that agreement.

124.     Although Lt. Burgess had informed Hayes Martin, Kristina Gray, Matt McCord, Dennis Larsen, Eric Nelson, and ADA Matt Kehoe that she had secured the "missing" evidence – none of them disclosed to Mr. Jamerson or his counsel that the evidence had been located. Instead, they agreed to allow the façade of a court-ordered search to go on.

125.     On August 14, 2022, Assistant City Attorney Martin wrote an email to Jamerson's counsel. Although Lt. Burgess had informed Martin that she had located additional evidence from Jamerson's case, Martin did not disclose that to counsel. While Martin claimed he was

attaching to his email "the records in [his] possession," in fact he withheld the records related to property receipt #AA9460 – records that Lt. Burgess had sent to Martin just two weeks earlier and the two had discussed at length. This was part of a pattern among the Defendants to withhold information about AA9460 from counsel. Rather than inform counsel that the evidence had been located, Martin sent counsel procedures that the City of Tulsa, TPD, and the District Attorney's Office had agreed on for counsel's search.

126.    At a squad meeting prior to counsel's search, Lt. Burgess told the TPD property room personnel, including Defendant Cozad, about item #6. She instructed the personnel not to disclose the existence of this evidence to Jamerson's counsel.  Instead, she directed that personnel should try to make counsel's search of the property room as difficult as possible.

127.    On August 17, 2022, Jamerson's counsel and Ms. Fuller conducted their search of the TPD property room. Although TPD Property Room Custodian Micheal Burgess, Assistant District Attorney Matt Kehoe, Assistant City Attorney Hayes T. Martin, and TPD Major Matt McCord were present during the search – and although they all knew that Lt. Burgess had secured the "missing" evidence – none of them disclosed that information to counsel. Consistent with the plan described by Lt. Burgess, they provided no assistance to counsel.

128.    After spending hours sifting through evidence in the freezer at TPD's evidence facility, counsel demanded to see the original property receipts for the evidence from Jamerson's case. Property receipt AA9460 clearly listed "item #6" as a sealed package containing "microscope slides generated during analysis." The property receipt contained a chain of custody log showing that *the forensic lab had returned this evidence to the TPD property room in 1997.*

129.    When Jamerson's counsel demanded to see item #6, the thirty-year conspiracy to hide the evidence from his case finally came to an end. TPD officers retrieved item #6, which

Jamerson's counsel discovered included a slide created from the vaginal wash performed during Ms. Davis's rape exam – the same sample the prosecution's witness, forensic chemist Ann Morris, testified contained spermatozoa consistent with coming from Jamerson.

130. ___**Within an hour** of viewing the original property receipt, Jamerson's counsel obtained the DNA evidence that TPD, the City of Tulsa, and the District Attorney's Office had repeatedly insisted had been destroyed.___ The evidence had been in TPD's possession for the entire 24 years Jamerson spent in prison, and the 7 years following his release. **Locating it was as simple as looking at the property receipt, which plainly identified the evidence and its location.** Yet, TPD, the City of Tulsa, and the District Attorney's Office either never bothered to look – despite multiple requests and even a court order to do so – or they knew of the existence of the evidence and willfully concealed it.

131. On October 17, 2022, the Tulsa County District Court ordered an investigator with the District Attorney's Office to deliver this evidence to Bode Technology (Bode), a private provider of DNA forensic services in Lorton, Virginia. Bode subjected the sample on the slide to STR DNA testing – a form of DNA testing not available prior to trial. The STR DNA testing confirmed the presence of male DNA on the slide, but **conclusively _excluded Jamerson_** as the source of that DNA.

**C. More than 30 years after Jamerson's conviction, he obtained reams of material, exculpatory documents that were never produced to his counsel before trial.**

132. In January 2023, Mr. Jamerson obtained **_hundreds of pages of documents that had never been disclosed to Jamerson or his counsel_** – including witness statements, police reports, and forensic testing results. The documents contain reams of undisclosed exculpatory evidence, including evidence that:

- multiple witnesses identified a different individual as the likely assailant;

- when describing her assailant, Dubbs identified a man who was three inches shorter and 30-35 pounds lighter than Jamerson;

- witnesses stated that Kenneth Duncan, an assistant manager at Ma Bell's and a witness of the robbery, was acting strangely on the night of the robbery and had inexplicably left off the lights in the back of the restaurant, where the robber entered;

- before Jamerson's trial, Duncan pled guilty to a charge of false impersonation for giving a fake name to TPD officers investigating the robbery and assault;

- before Jamerson's trial, Duncan also pled guilty to a charge of uttering a forged instrument for stealing payroll checks from Ma Bell's;

- during their investigation, TPD officers pulled a photo of Jamerson prior to creating a "composite drawing" of the rape suspect – and then observed that their drawing bore a "remarkable resemblance" to their photo of Jamerson;

- the TPD Forensic Laboratory identified numerous "Caucasoid" pubic hairs and head hairs on the clothes TPD recovered from Dubbs on the night of the assault, but found no hairs from any black individual such as Jamerson; and

133.    This exculpatory evidence was never provided to Jamerson or his counsel prior to trial. Nor was any of this evidence included in the probable cause affidavit filed in his case.

## JAMERSON'S EXONERATION

134.    At a hearing on July 9, 2024, the Tulsa County District Court concluded Mr. Jamerson was entitled to post-conviction relief and vacated his criminal convictions. During that hearing, **the District Court stated it was "troubled for a number of reasons," including specifically that "evidence which was material seems to have been withheld."** The Court stated:

> The most troubling is that there is evidence... that someone other than Mr. Jamerson was identified as the possible assailant of the victim and that this fact was not investigated. And worse yet, that this was not disclosed to the Defense prior to trial. This evidence is exculpatory. It is material and it is favorable to the defense and should have been disclosed. It raises questions as to the confidence [in] the jury's verdict and had it been disclosed, it is reasonable to believe the results of this trial may have been different.

135.     In its written Order, the District Court emphasized TPD's failure to conduct any meaningful investigation, finding that "TPD records reflect no effort to interview or investigate Nails." The court also emphasized how TPD's manipulation of Ms. Davis was critical to securing Mr. Jamerson's wrongful conviction, noting that "[g]iven the inconclusive physical evidence admitted at trial, no reasonable jury could have convicted Jamerson if they had heard from the victim herself – the sole witness – that she had never independently identified her assailant and that TPD had convinced her Jamerson was her assailant."

136.     The District Court concluded that "Jamerson has clearly established a prima facie case of innocence. Newly discovered DNA evidence conclusively excludes him has the perpetrator of the rape for which he was convicted. No other reliable evidence connects him to the crime.  Accordingly, Jamerson is entitled to a finding of actual innocence."

## TPD'S AND THE CITY OF TULSA'S SYSTEMIC PRACTICES

137.     The unconstitutional and tortious acts of the defendant detectives, officers, attorneys, and property room employees were not isolated incidents but were instead part and parcel of an entrenched custom, policy, pattern, or practice within the Tulsa Police Department and the Tulsa Police Department Property and Evidence Facilities. Defendants TPD and the City of Tulsa had a custom, policy, pattern, or practice of, without limitation:

(i)     Fabricating inculpatory evidence;

(ii)    Using manipulative and unduly suggestive identification procedures;

(iii)   Failing to adequately investigate other leads;

(iv)    Withholding material exculpatory or impeachment evidence from prosecutors;

(v)     Failing to intervene to prevent constitutional violations;

(vi)    Failing to properly supervise, train, and discipline detectives, officers, and Property Room staff;

(vii) Withholding material exculpatory evidence from defendants seeking post-conviction relief; and

(viii) Maintaining a Constitutionally deficient system of storing evidence.

## A. TPD'S CUSTOMS OF FABRICATING INCULPATORY EVIDENCE, WITHHOLDING MATERIAL EXCULPATORY OR IMPEACHMENT EVIDENCE, FAILING TO ADEQUATELY INVESTIGATE, FAILING TO INTERVENE, AND FAILING TO PROPERTY SUPERVISE, TRAIN, AND DISCIPLINE

138.     Defendant City of Tulsa had customs, policies, or patterns and practices of fabricating inculpatory evidence, failing to adequately investigate other leads, withholding material exculpatory or impeachment evidence from prosecutors, and failing to properly train, supervise, or discipline officers concerning the execution of lawful investigations, how to conduct a proper identification procedure and interview, how to create a proper composite drawing, how to conduct a proper photo line-up, the legal obligation to disclose exculpatory and impeachment material to the prosecution, and the legal duty to intervene to prevent the violation of defendants' constitutional rights.

139.     TPD had no written policies or inadequate written policies, procedures, or guidelines concerning the execution of lawful investigations, constitutionally adequate interview and interrogation techniques, proper photo line-up procedures, the legal obligation to disclose exculpatory and impeachment material to the prosecution, and the legal duty to intervene to prevent the violation of defendants' constitutional rights. To the extent TPD had such written policies, procedures, or guidelines, they were neither followed nor enforced.

140.     Predictably and inevitably, these customs and practices caused untold numbers of defendants to be wrongfully convicted.  For example, in 1989, Arvin McGee was wrongfully convicted of kidnapping and rape. Like Mr. Jamerson, Mr. McGee was later conclusively exonerated by DNA testing, and the conviction against him was vacated and dismissed on the

basis of his actual innocence – but not before Mr. McGee was wrongfully imprisoned for nearly 14 years.

141.     Like Ms. Davis in Mr. Jamerson's case, the victim's identification of Mr. McGee was based on a composite sketch and an unduly suggestive photo lineup. After Mr. McGee was cleared, **the victim stated in a sworn affidavit that TPD officers told her to pick Mr. McGee from the lineup – the same manipulation they used in Mr. Jamerson's case**. Following a civil rights trial, a jury awarded Mr. McGee $14.5 million. The jury determined the City of Tulsa had been deliberately indifferent to Mr. McGee's constitutional rights in light of the City's complete lack of written policies on the proper execution of rape investigations and constitutionally adequate identification procedures.

142.     In 1991, Corey Atchison was wrongfully convicted of murder. Like in Mr. Jamerson's case, there was no physical evidence tying Mr. Atchison to the crime scene. TPD failed to investigate leads, suppressed evidence of the true culprit, and coerced teenagers to falsely identify Atchison as the perpetrator. Mr. Atchison spent 28 years unjustly imprisoned before suppressed evidence came to light in 2018. Mr. Atchison's conviction was set aside in 2019.

143.     Malcom Scott and De'Marchoe Carpenter spent nearly 20 years in prison after they were wrongfully convicted of a drive-by shooting. Like Mr. Jamerson, Scott's and Carpenter's convictions were based on manipulated false statements and testimony by vulnerable teenage witnesses. Just as TPD officers told Ms. Davis they had identified Jamerson as her assailant and insisted that she go along that identification, in the Scott and Carpenter case one witness later stated under oath, "After several interviews with several officers, I was told that De'Marco [sic] Carpenter and Malcolm Scott were the shooters and I just needed to point them out when the time came."

144.    Like in Mr. Jamerson's case, TPD failed to investigate meaningfully, did not disclose that they had fabricated testimony, and suppressed evidence pointing to the real perpetrator, who later confessed – exonerating Mr. Scott and Mr. Carpenter.

145.    In 1994, seventeen-year-old Michelle Dawn Murphy was wrongfully convicted of murdering her 3-month-old son. Like Mr. Jamerson's conviction, Ms. Murphy's conviction was based on the manipulative interrogation of a teenager, fabricated inculpatory evidence, and a false, exaggerated, and misleading forensic report. Additionally, TPD failed to investigate meaningfully, including refusing to disclose or investigate an alternate suspect and failing to disclose exculpatory forensic evidence. Like Mr. Jamerson, Ms. Murphy was conclusively exonerated by DNA testing, and the conviction against her was dismissed.

146.    In 1996, Sedrick Courtney was wrongfully convicted of burglary and armed robbery. Like Mr. Jamerson, Mr. Courtney was later conclusively exonerated by DNA testing, and the conviction against him was vacated and dismissed on the basis of his actual innocence. Also like Mr. Jamerson, Mr. Courtney's conviction was based on erroneous forensic evidence and TPD officers' fabrication of the victim's identification of him.

147.    Just as in Jamerson's case, the victim in Mr. Courtney's case initially gave no distinctive physical description of her assailants, apart from stating that they were two black, masked men. Months later, however, she purported to be able to describe one assailant's height and weight, claimed to recognize his coat, and claimed to have viewed a portion of his face during the robbery.  Pursuant to TPD's customs and practices, TPD detectives had used improperly suggestive interview techniques and identification procedures to cause the victim and sole witness to identify Courtney as her attacker – just as they did in Jamerson's case. Although the victim had previously stated that her assailants were masked, TPD detectives had her

participate in a photo lineup and influenced her to select a photograph of Mr. Courtney as her assailant.

148.    Just as in Jamerson's case, TPD also failed to conduct any meaningful investigation whatsoever into suspects other than Mr. Courtney. TPD knew that the victim shared her apartment with a known drug dealer, and that the men who had invaded her home had repeatedly asked about the drug dealer's whereabouts and his "loot." Yet TPD completely failed to investigate these leads. And just as in Jamerson's case, TPD also failed to conduct any meaningful investigation into the identity or whereabouts of the second perpetrator.

149.    Defendant City of Tulsa knew or should have known that the failure to maintain and/or enforce adequate written policies and procedures and to adequately train, supervise, and discipline Defendants Hunter, Daniels, Witt, and others in these procedures and obligations created a substantial risk of resulting in the unconstitutional and tortious acts set forth herein. These customs, policies, patterns, or practices were in reckless disregard for, or deliberate indifference to, Mr. Jamerson's rights.

### B. TPD'S AND THE CITY OF TULSA'S CUSTOMS AND PRACTICES OF VIOLATING DEFENDANTS' DUE PROCESS RIGHTS THROUGH DELIBERATE INDIFFERENCE TOWARD PROPER STORING, HANDLING, AND TRACKING OF EVIDENCE.

150.    Under Oklahoma law, when a defendant is convicted of a violent felony, TPD and the City of Tulsa have and had a legal duty to retain and preserve the biological evidence from the case, to provide an accurate inventory of all evidence related to the case, and to ensure an adequate chain of custody for that evidence.  With deliberate indifference toward defendants' Due Process rights, TPD and the City of Tulsa implemented a recklessly chaotic evidence management system that undermined the State's procedures by providing a fundamentally inadequate process of accessing evidence post-conviction.

151.    As of 2001, Defendants TPD and City of Tulsa knew or should have known that operating a Property Room that stores DNA evidence requires guarding against the known risk of bowing to pressure to produce results that support prosecutions and sustain convictions. TPD and the City of Tulsa further knew or should have known that two important systems are required for policing this risk: (1) adequate written Standard Operating Procedures governing how forensic evidence is cataloged and stored, and (2) effective supervision to detect and correct errors, whatever their cause.

152.    Despite this known and/or obvious risk, Defendants City of Tulsa and TPD had no or inadequate written Standard Operating Procedures and had no effective system of tracking and storing DNA evidence. The lack of such minimally adequate procedures and supervision created a culture in which DNA evidence was intentionally or erroneously lost, destroyed, or withheld.

153.    Specifically, TPD and the City of Tulsa had a custom, policy, or pattern and practice of withholding DNA evidence post-conviction and failing to properly supervise, train, and discipline officers and employees – including, without limitation, Mark Boese (now deceased), Whitehead, Burgess, Cozad, and Slay – concerning the storage, cataloging, and disclosure obligations for DNA evidence.

154.    Although the City of Tulsa's final policymakers and defendant Supervisors had actual or constructive notice of the outrageous and pervasive misconduct of TPD officers and property room employees, including their repeated mishandling and withholding of DNA evidence, they failed to properly supervise, train, or discipline them.

155.    In violation of defendants' Due Process rights and of Oklahoma law, TPD and the City of Tulsa created a system of evidence storage and tracking that created obvious conflicts of interest. Instead of placing control of evidence under civilians working in the forensic lab, TPD

41

ran (and continues to run) its own property room using sworn officers within the TPD chain of command. Rather than ensuring the independence and objectivity of the forensic lab, this structure places evidence under the control of sworn officers who have incentives to hide exculpatory evidence to ensure and maintain convictions and to protect the reputation of the department and their fellow officers.

156. As a result of this policy, when TPD was trying to solve cold cases, officers in the property room would exercise great care and diligence to try to locate evidence. But when defendants attempted to find exculpatory evidence, property room personnel had a practice and custom of either not attempting to locate the evidence or making only halfhearted attempts to do so. TPD and the City of Tulsa knew or should have known this system created unacceptable risk of mishandling of evidence and violating defendants' constitutional rights, but they retained the system with deliberate indifference toward that risk.

157. As a result of this untrustworthy system, civilians in TPD's forensic lab did not trust the sworn officers to properly store and track evidence from criminal cases. The result was complete disorganization within both the property room and the lab. For example, rather than keeping evidence intact in the property room, lab employees had a practice and custom of taking half of each item in a sexual assault kit and storing it separately at the lab, because they did not trust the sworn officers in the property room not to ruin or dispose of the evidence. Staff at TPD's forensic laboratory routinely split samples, changed containers, and did not keep proper records.

158. Lab employees also had a practice and custom of improperly squirrelling away evidence, thereby virtually ensuring that evidence would be lost. For example, civilian TPD lab employee Carol Cox, who performed hair analysis for the lab, took a U-Haul of hair slide evidence home with her when she retired – despite the fact that these slides could be subjected to

42

DNA testing that was unavailable when the underlying criminal cases were tried. Cox retained these slides at her personal residence because she did not trust TPD to maintain the evidence.

159.     TPD and the City of Tulsa continued to store evidence at facilities that were grossly deficient for that purpose. Some of these facilities lacked climate control, had leaking roofs, and were infested by rats that eat evidence. When TPD officers saw water leaking from the roof onto shelves containing evidence, they would simply move the shelf over by a foot. These practices were part of TPD's broader pattern and practice of deliberate indifference toward the proper storage and maintenance of evidence.

160.     TPD and the City of Tulsa had a custom and practice of commingling stolen goods with evidence from criminal trials. This practice resulted in critical evidence being destroyed, despite lab employees urging TPD property room employees to retain all biological materials.

161.     TPD and the City of Tulsa also failed to implement and enforce minimally adequate policies and standards to ensure an organized process of transferring evidence. As a result, evidence was transferred without a clear chain of custody. Because of these unconstitutional practices, TPD lost or improperly destroyed evidence regularly. In addition, this lack of minimally necessary procedures allowed officers to report that evidence was "lost" whenever they did not want the evidence to be found. TPD and the City of Tulsa knew this absence of adequate policies and procedures – and failure to enforce any such policies and procedures – created a serious risk of losing evidence, but continued to maintain these deficient procedures with deliberate indifference to that risk.

162.     As another example, rather than properly storing microscope slides in sealed envelopes that were marked with the corresponding property receipt number, TPD kept countless such slides all mixed together in a bucket. Accordingly, any slide that was not marked

with the correct property receipt or incident number could not be traced and/or would be filed under the wrong case.

163.    In 1997, TPD's forensic laboratory returned to the property room countless slides that had been lying around in piles at the laboratory. That evidence included slides that contained DNA from the rape kit in Mr. Jamerson's criminal trial. Instead of properly logging and storing this evidence and documenting its location, TPD property room personnel recorded and stored this evidence in a way that would allow TPD personnel to retrieve it or hide it, as they preferred.

164.    Further evidencing this pattern of deliberate indifference toward the proper storage and tracking of evidence in criminal cases, TPD and the City of Tulsa also knowingly hired and retained crime lab personnel with documented histories of serious mishandling of evidence. In 1995, TPD revealed that a power outage caused a freezer containing biological samples to lose power. Although the outage caused an alarm to sound, the lab's director, Ron Pogue, simply turned off the alarm without checking the freezer's power.  Pogue's shocking dereliction of duty caused as many as 778 samples from rape and homicide cases to be damaged and/or contaminated. Nevertheless, consistent with TPD's and the City of Tulsa's deliberate indifference toward implementing appropriate evidence handling procedures and exercising proper supervision of its personnel, TPD retained Pogue as a forensic chemist at the lab.

165.    Tellingly, at that time the District Attorney's Office stated it believed the contamination of nearly 800 samples of evidence from rape and homicide cases was not a problem in any way, apart from generating bad press. An Assistant District Attorney claimed that "[t]he contaminations will present no courtroom problems that can't be handled."  The ADA insisted, "The only problem I can find is one of explaining why there is no problem…"

166.     Later that same year, TPD hired Carla Noziglia to be its new director of the forensic laboratory – including its new DNA lab – despite knowing that she had been forced out of that same position for mishandling evidence at the Las Vegas police department's crime lab. Noziglia had been demoted and eventually forced to retire from that police department because she had mishandled evidence in murder cases. In one murder case, Noziglia knew that a hair sample was contaminated prior to her sending it to an outside lab for analysis, but she never told detectives that the test results were flawed. An internal affairs investigation recommended she be fired.

167.     Despite knowing that Noziglia knowingly mishandled evidence and hid that information from police investigators, TPD Chief of Police Ron Palmer stated "we feel very comfortable in hiring her" to be the first director of TPD's planned DNA lab.  Again, TPD's "comfort" with entrusting its laboratory to Noziglia – who was known to have mishandled evidence in murder cases and hidden that information from police – was consistent with TPD's and the City of Tulsa's custom and practice of deliberate indifference toward exercising proper supervision of its personnel.

168.     In 1999, TPD hired Mark Boese to be its laboratory director. In that role, Boese "failed to perform his duties as lab director . . . and failed to properly supervise." His performance in that role "evince[d] a clear and incontrovertible pattern and practice of incompetence, inefficiency, and gross neglect of duty." His failures included failing to "properly locate and secure evidence." Numerous improperly handled and incomplete files, as well as items of evidence, were found in Boese's office. Interim Chief of Police Chuck Jordan made clear that TPD had allowed Boese's gross neglect of duty to continue "for many years."  Yet again, the repeated hiring, retention, and failure to supervise incompetent and grossly neglectful lab

directors – over at least a 15-year period – shows this practice was a well-established custom with TPD.

169.     The City of Tulsa and TPD were on actual or constructive notice of the systemic breakdowns of custody and control of evidence and other outrageous misconduct in the handling of evidence, yet they failed to properly discipline lab supervisors or property room employees, to train them on their constitutional obligations, or to conduct any meaningful review of their past or ongoing work for similar misconduct. On the contrary, the supervision these employees received condoned, facilitated, and encouraged these unconstitutional practices.

170.     The City of Tulsa and TPD knew or should have known that the failure to adequately train and supervise officers and property room employees in their constitutional obligations and proper procedures for storing, handling, and tracking evidence would cause defendants' constitutional rights to be violated.

171.     Predictably and inevitably, TPD's and the City of Tulsa's unconstitutional customs and practices repeatedly resulted in violations of defendants' Due Process rights to access evidence in efforts to obtain post-conviction relief. Indeed, this custom and practice was so deeply ingrained at TPD and the City of Tulsa that they repeatedly withheld and mishandled evidence post-conviction even when under court orders to preserve and produce the evidence.

172.     For example, in 2004, while Michelle Murphy was serving a life sentence for a murder she did not commit, the Tulsa County District Court ordered TPD to send seven items of physical evidence to an independent laboratory for DNA analysis. In response, TPD's forensic laboratory retrieved and examined each item, but withheld three items of evidence from production to defense counsel – including a piece of bloody fabric that contained the DNA evidence that would ultimately prove Murphy's innocence. As a result of TPD's customs and

practices of withholding evidence post-conviction, Ms. Murphy needlessly spent another 10 years in prison.

173.     This was not the only evidence TPD withheld from Ms. Murphy after her conviction. On September 3, 2004, the Oklahoma Indigent Defense System sent an email to TPD forensic lab director Mark Boese, requesting a sample of blood from William Lee – a "witness" to the murder who may have been the true perpetrator. Although defense counsel provided Lee's case file number and property receipt, TPD responded that the blood evidence could not be located.

174.     As Ms. Murphy continued to demand access to the evidence that would prove her innocence, in 2013 ADA Jimmy Dunn again claimed Lee's blood could not be located – just as he and his fellow ADAs did in Jamerson's case. ADA Dunn falsely claimed the blood could not be located because it had been stored under the name "Lee William" instead of "William Lee." But when that blood was eventually produced, it was packaged in an envelope labeled "Two Tubes of Blood William M. Lee" and marked with the same case number that OIDS had provided in 2004. Dunn later told Murphy and her counsel they were "lucky" that Lee's blood and semen had not been destroyed.

175.     In December 2013, Murphy's counsel met with ADA Dunn and Assistant City Attorney Michelle McGrew at the TPD property room to examine evidence related to William Lee. During that meeting, Murphy's counsel was handed an evidence log, attached to which was a memo that counsel believed warned TPD that cooperation with Ms. Murphy would cause the City to be sued.

176.     In 2014, Murphy obtained a court order allowing her attorneys to inspect evidence from the case. The order explicitly stated that the evidence would only be handled in the presence of Ms. Murphy's agents until it was sealed. In violation of that order, TPD's forensic

lab director, Tara Brians (Tara "Valouch" at the time), selectively chose items of evidence to produce and – outside the presence of Ms. Murphy's counsel – repackaged that evidence. Even after Brians repackaged the evidence in violation of the District Court's order, it was obvious the evidence had previously been mishandled and mislabeled.

177.    As a result of TPD's and the City of Tulsa's customs and practices of deliberate indifference toward Murphy's legal right to access evidence post-conviction, Murphy needlessly spent an additional 10 years in prison.  Just as in Jamerson's case, the evidence that would prove her innocence sat in TPD's custody that entire time.

178.    TPD's and the City of Tulsa's customs and practices likewise ensured that Cedrick Courtney needlessly languished in prison for 10 years, as TPD again falsely claimed the critical evidence from his case had been "destroyed." As described above, Sedrick Courtney was wrongfully convicted of burglary and armed robbery in 1996. For more than a decade after his conviction, Mr. Courtney's lawyers repeatedly asked for the physical evidence collected from the crime scene so that they could subject it to DNA testing. In response – just as in Jamerson's case – TPD repeatedly, falsely insisted the evidence had been destroyed.

179.    In 2000, the Oklahoma Indigent Defense System requested access to the physical evidence from Mr. Courtney's case so that it could be subjected to DNA testing. Pursuant to their custom and practice of mishandling, hiding, and failing to properly search for evidence, TPD responded that the hair evidence from his case had been destroyed.  Just as in Jamerson's case, this was entirely false. But based on this false claim, OIDS concluded it had no choice but to close Mr. Courtney's case. Months later, TPD would give OIDS the same false response to their request for the physical evidence from Jamerson's case. OIDS therefore closed his case as well.

180.     In 2007, the Innocence Project again contacted TPD in an attempt to locate the physical evidence from Mr. Courtney's case. Once again – as further evidence of TPD's custom and standard practice – TPD again falsely claimed this evidence had been destroyed.

181.     In 2011, the Innocence Project again demanded that TPD produce the "missing" evidence. Finally, TPD admitted that it did, in fact, have custody of the evidence. It had been in TPD's custody the entire time. When that evidence was submitted for DNA testing, the results excluded Courtney as a donor of the evidence found at the crime scene. Courtney needlessly spent more than 10 years in prison because of TPD's customs and practices of mishandling evidence, hiding evidence, failing to search for evidence, and falsely claiming evidence had been destroyed. The City of Tulsa eventually settled the civil suit that followed Mr. Courtney's exoneration.

182.     Henry Jamerson fell victim to precisely the same practices and customs that caused Michelle Murphy, Cedrick Courtney, and untold other wrongfully convicted defendants to spend decades in prison as TPD mishandled, hid, and/or lost the evidence that would prove their innocence. As summarized above, for more than two decades, Mr. Jamerson repeatedly requested the evidence collected in his case, including samples from the sexual assault kit. Each time, he was told – falsely – that this evidence had been destroyed. As a result of TPD's and the City of Tulsa's unconstitutional customs and practices, he needlessly spent 14 more years in prison and another 9 as a convicted felon and registered sex offender following his release.

183.     Moreover, even when TPD officers and City of Tulsa attorneys acknowledged in writing – internally – that they had the evidence from Jamerson's case in their possession, they took no steps whatsoever to notify his counsel of that fact. Instead, in keeping with their custom and practice of denying access to evidence post-conviction, they removed the evidence and placed it in a gun locker just before Jamerson's counsel undertook a search of the property room.

184.     The sheer number of TPD and City of Tulsa officers and attorneys who knew the evidence had been located and failed to disclose it – including without limitation TPD Property Room Custodian Lt. Burgess, TPD Deputy Chief Matt McCord, then-TPD Captain (now Chief) Dennis Larsen, TPD Captain Eric Nelson, and City of Tulsa attorneys Hayes Martin and Kristina Gray – shows that these practices were a well-established custom at TPD and the City of Tulsa.  Indeed, even after Lt. Burgess wrote a memo to then-TPD Chief Franklin notifying him of the discovery of the DNA evidence and her role in hiding it from Jamerson's counsel, neither Chief Franklin nor anyone else at TPD or the City of Tulsa disclosed this information.

## DAMAGES

185.     The unlawful actions of Defendants caused William Henry Jamerson to spend over twenty-four years in prison and nine years registered as a sex offender for a brutal crime he did not commit.

186.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Jamerson sustained, and continues to sustain, injuries and damages, including loss of his freedom, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, injury to his reputation, loss of friends, the loss of his family's company during his incarceration, loss of consortium, the reasonable and necessary expenses associated with the defense he was compelled to present in the criminal action (including, but not limited to, his attorney's fees), and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

# CLAIMS FOR RELIEF

## COUNT I

### DUE PROCESS:
### FABRICATION OF EVIDENCE

187.     Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

188.     Prior to Mr. Jamerson's criminal trial, Defendants Hunter, Daniels, Witt, and Morris, acting within the scope of their employment and under color of state law, fabricated evidence by using unduly suggestive identification procedures that were highly likely to, and in fact did, lead the victim and sole witness to misidentify Jamerson as her assailant. That evidence included, without limitation, that:

- after Defendant Hunter pulled a photo of just one individual – Henry Jamerson – and shared it with Daniels, Daniels enlisted an unqualified TPD officer (Defendant Witt) to work with the victim to create a purported "composite drawing" of the suspect;

- on information and belief, Defendant Witt created a "composite drawing" after having seen the photograph of Jamerson – and only Jamerson – and knowing he was the lone suspect;

- after completing the purported "composite drawing," Defendant Daniels showed the victim and sole witness the photo of Jamerson and told her the drawing was a "perfect match" of the photo of Jamerson;

- Defendants Daniels repeatedly showed the victim the photo of Jamerson and told her TPD had conclusively identified him as her assailant;

- on information and belief, Defendants Hunter and/or Witt affirmed to Davis that TPD had conclusively identified Jamerson as her assailant;

- Defendant Daniels conducted an alleged photo lineup only after repeatedly showing the victim the photo of Jamerson and telling her they had conclusively identified him as her assailant;

- Daniels – who was investigating the assault and who had a photograph of Jamerson (and no one else) in her case file – conducted the alleged photo lineup herself, rather than using a neutral "blind administrator;"

- Daniels showed the victim and sole witness a photo array consisting of only 5 photos;

- apart from Jamerson's photo, Daniels included in the alleged photo lineup only photos of men who were much taller and heavier than Jamerson, and who therefore bore much less resemblance to the victim's description of her assailant;

- Daniels pressured the victim to make an identification of Jamerson despite Ms. Davis's statements that she "wasn't sure" and "wasn't going to blame anybody" because she had "just caught a glimpse of him;"

- Defendant Daniels told the victim that Mr. Jamerson had previously worked at Ma Bell's, thereby enhancing the credibility of their claim that he was the man who had attacked her there;

- Defendants Daniels and Hunter created and shared with prosecutors police reports that falsely claimed Ms. Davis had independently identified Jamerson as her assailant, and that omitted critical exculpatory evidence relating to the unduly suggestive tactics they had used to convince Davis to misidentify Jamerson;

- on information and belief, Defendant Witt altered the "composite drawing" without the victim's knowledge prior to trial;

- prior to trial, Defendant Daniels falsely told the victim that Jamerson's semen had been found in her vagina during her rape exam, which conclusively confirmed TPD's identification of Jamerson as her assailant.

189. As a direct and proximate result of these unduly suggestive procedures, Ms. Davis – the victim and sole witness to the attack – misidentified Mr. Jamerson as her assailant both before and at trial. Moreover, the District Attorney's Office used Defendant Witt's purported "composite drawing" as evidence against Mr. Jamerson at trial.

190. Defendants Hunter and Daniels fabricated evidence by falsifying police reports that, *inter alia*, misrepresented the process used to identify Jamerson and falsely claimed that the victim had independently identified him. Defendants Hunter and Daniels provided these falsified reports to the District Attorney's Office, which relied on them in pursuing the prosecution and conviction of Mr. Jamerson.

191. On information and belief, Defendant Morris fabricated serology test results to falsely implicate Jamerson as Ms. Davis's assailant. She knowingly provided these falsified test

results to the District Attorney's Office, which relied on them in pursuing the prosecution and conviction of Mr. Jamerson.

192.    On information and belief, during Mr. Jamerson's criminal trial, Defendant Morris fabricated evidence by giving false testimony under oath based on her falsified serology test results. The District Attorney's Office repeatedly used Morris's false testimony to persuade the jury that the physical evidence was consistent with Jamerson being Ms. Davis's assailant – even though Morris knew the physical evidence conclusively excluded him.

193.    Defendants Hunter, Daniels, Witt, and Morris fabricated this evidence intentionally or knowingly.

194.    As a direct and proximate result of the fabrication of evidence by Defendants Hunter, Daniels, Witt, and Morris, Mr. Jamerson was wrongfully prosecuted, convicted, incarcerated for 24 years, and forced to live 9 additional years as a convicted felon and registered sex offender.

195.    Each of the aforementioned Defendants is liable personally for these acts that damaged Jamerson.

196.    Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendants Daniels, Hunter, and Witt, for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT II

### DUE PROCESS:
### VIOLATIONS OF *BRADY V. MARYLAND*

197.    Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

198.    Prior to Mr. Jamerson's criminal trial, Defendants Hunter, Daniels, Witt, and

Morris, acting within the scope of their employment and under color of state law, suppressed

material exculpatory and/or impeachment evidence, including without limitation that:

- Defendants Hunter, Daniels, and Witt had used unduly suggestive identification procedures that were highly likely to, and in fact did, lead the victim and sole witness to misidentify Jamerson as her assailant.

- Defendants Hunter and Daniels did not investigate alternative suspects – including the individual identified as the likely assailant by multiple witnesses of the robbery – and did not interview Jamerson to determine whether he had an alibi or to discover other material evidence.

- Defendants Hunter and Daniels submitted false police reports to the District Attorney's Office.

- Defendant Morris generated false serology test results that wrongly implicated Jamerson as Ms. Davis's assailant.

199.    The evidence suppressed by Defendants Hunter, Daniels, Witt and Morris was

material exculpatory and/or impeachment evidence. There is a reasonable probability that, had

Defendants not unlawfully suppressed this evidence, Jamerson would not have been convicted.

Defendants' suppression of this evidence deprived Jamerson of a fair trial.

200.    In wrongfully suppressing material evidence, Defendants Hunter, Daniels, Witt,

and Morris acted with deliberate or reckless intent.

201.    The suppression of this evidence was prejudicial and caused Jamerson to be

wrongfully convicted, incarcerated for 24 years, and forced to live as a convicted felon and

registered sex offender for an additional 9 years.

202.    By failing to disclose, concealing, and misrepresenting this evidence, Defendants

Hunter, Daniels, Witt, and Morris violated the Fourteenth Amendment, as interpreted by *Brady*

*v. Maryland*, 373 U.S. 83 (1963), which imposed a clear duty on the Defendants not to conceal,

suppress, and/or misrepresent obviously exculpatory evidence, and rather to report all material exculpatory and impeachment evidence to prosecutors.

203.     Each of the aforementioned Defendants is liable personally for these acts that damaged Jamerson.

204.     Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendants Daniels, Hunter, and Witt, for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT III

### MALICIOUS PROSECUTION

205.     Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

206.     Defendants Hunter, Daniels, Witt, and Morris accused Mr. Jamerson of criminal activity, knowing those accusations to be without genuine probable cause, and they made false statements, fabricated evidence, and failed to disclose exculpatory evidence, with the intent of influencing and continuing judicial proceedings against him.

207.     Defendants Hunter, Daniels, Witt, and Morris, acting within the scope of their employment and under color of state law, caused Mr. Jamerson to be wrongfully arrested and detained pursuant to legal process despite knowing that:

- no physical evidence linked Jamerson to the assault on Ms. Davis or the crime scene;

- Jamerson was excluded as the contributor of all pubic and head hairs found on Ms. Davis during her sexual assault exam;

- Jamerson was excluded as the source of spermatozoa found in the victim's vagina during her sexual assault exam;

- on information and belief, Ann Morris had fabricated serology test results to support a claim that Jamerson could be the source of the spermatozoa identified during the rape exam;

- Ms. Davis was initially unable to give any description of her assailant, other than stating that he was black and that she did not know him;

- despite having no description of the assailant, Defendants Hunter and Daniels immediately settled on Jamerson as their suspect for no other reason than that he used to work at Ma Bell's, he was black, and they had a photo of him;

- Ms. Davis never independently identified Jamerson as her assailant – instead, Defendants Hunter, Daniels, and Witt told her they had conclusively identified him as her attacker;

- Defendants Hunter, Daniels, and Witt used unduly suggestive procedures to manipulate the victim and sole witness into identifying Jamerson as her assailant, as described above;

- multiple witnesses identified a different individual, Quinton Nails, as a likely perpetrator of the assault on Ms. Davis;

- TPD officers never conducted any investigation whatsoever of Mr. Nails or of any individual other than Mr. Jamerson;

- Defendants Hunter, Daniels, Witt, and Morris purposefully ignored evidence suggesting Mr. Jamerson's innocence;

- TPD officers never interviewed Mr. Jamerson before arresting him, after he was in custody, or at any time before his trial.

208.    In short, no probable cause supported Jamerson's arrest, confinement, and prosecution and Defendants Daniels, Hunter, Witt, and Morris knew or should have known this.

209.    Defendants Daniels, Hunter, Witt, and Morris caused the prosecution of Mr. Jamerson maliciously and without probable cause by, *inter alia*, wrongfully fabricating evidence, using unduly suggestive identification procedures, settling on Jamerson as their suspect without any reasonable basis, ignoring exculpatory evidence, and refusing to conduct any meaningful investigation – as well as by hiding this misconduct.

210.     Defendants Daniels, Hunter, Witt, and Morris presented fabrications and made material omissions of exculpatory evidence to the Tulsa County District Attorney's Office, which then authorized the arrest and prosecution of Mr. Jamerson.

211.     Defendants Daniels, Hunter, Witt, and Morris were aware of violations of Jamerson's constitutional rights and had opportunities to intervene, yet they failed to take reasonable steps to prevent them.

212.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to Mr. Jamerson's rights.

213.     The foregoing conduct operated to deprive Mr. Jamerson of important and well established rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of Oklahoma, including Jamerson's right not to be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to be free from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence, and his incarceration for twenty-four years.

214.     As a direct and proximate result of the malicious conduct of Defendants Daniels, Hunter, Witt, and Morris, Henry Jamerson was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction, wrongfully imprisoned for twenty-four years, and then forced to live as a convicted felon and registered sex offender for an additional 9 years. Mr. Jamerson's arrest and the judicial proceedings against him were instituted and continued maliciously, resulting in damages as more fully described above.

215.     The criminal action against Mr. Jamerson was terminated in his favor by the Tulsa County District Court, which vacated his conviction and found that "Jamerson is entitled to a finding of actual innocence."

216.     Defendants Daniels, Hunter, Witt, and Morris are each liable personally for these acts that damaged Jamerson.

217.     Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendants Daniels, Hunter, Witt, and Morris for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT IV

### VIOLATION OF DUE PROCESS:
### ACCESS TO EVIDENCE POST-CONVICTION

218.     Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

219.     Under Oklahoma law – including without limitation 22 O.S. § 1372 and 22 O.S. § 1373.2 – when a defendant is convicted of a violent felony, TPD and the City of Tulsa have and had a legal duty to retain and preserve the biological evidence from the case, to provide an accurate inventory of all evidence related to the case, and to ensure an adequate chain of custody for that evidence. Oklahoma's laws create a liberty interest in proving a prisoner's innocence with DNA evidence.

220.     Defendants Dennis Larsen, Becky Johnson, Hayes Martin, Micheal Burgess, James Slay, Kathleen Whitehead, Jon Cozad, and Tara Brians (collectively, the "Evidence-Hiding Defendants"), had a legal duty to register, store, preserve, track, and/or produce material and critical evidence relating to the crimes for which Jamerson was charged and convicted.

These defendants had a legal duty to retain and preserve the biological evidence from the case, to provide an accurate inventory of all evidence related to the case, and/or to ensure an adequate chain of custody for that evidence. These defendants also had a legal duty to preserve, control, and produce such evidence at Jamerson's request.

221.     Acting within the scope of their employment and under color of state law, the Evidence-Hiding Defendants intentionally, knowingly, recklessly, negligently, and/or with deliberate indifference failed to register, preserve, maintain, control, and/or produce material and critical evidence relating to the crimes for which Jamerson was charged.

222.     The Evidence-Hiding Defendants intentionally, knowingly, recklessly, negligently, and/or with deliberate indifference failed to properly track and maintain custody of the physical evidence from Jamerson's criminal case, failed to make meaningful efforts to locate this evidence, falsely claimed the evidence had been destroyed, and/or purposefully hid this critical evidence from Mr. Jamerson and his counsel.

223.     Although the Oklahoma Indigent Defense System had expressly urged TPD to preserve evidence from Jamerson's case in 2001 – and although TPD expressly agreed to do so – that same year, TPD falsely claimed that they had "destroyed whatever evidence they had in their possession." Relying on that false claim, OIDS attorney Kathleen Smith told Jamerson "[w]e have now exhausted all of our known options for locating evidence in your case. Since a requirement for acceptance into the DNA Forensic Testing Program is the existence and availability of testable evidence, we must now close your file." TPD's false claim in 2001 caused Jamerson to spend another 14 years in prison, plus an additional 9 as a convicted felon and registered sex offender.

224.     Again in 2014, OIDS was unable to locate the critical DNA evidence from Jamerson's criminal case, because the director of TPD's forensic laboratory claimed his office had searched for the evidence and had determined it had been "disposed of."

225.     On March 22, 2016, TPD Laboratory Director Tara Brians received an email from Sr. Assistant Attorney Shelton Benedict, in which he attached a request by Jamerson's counsel "directing TPD to preserve documents and other items related to the conviction of William Henry Jamerson in Tulsa County Case # CF-1991-3429. The Property Receipts numbers are AA9460 and AA9462..." Two days later, Defendant Brians was informed by Cpt. Karen Tipler, TPD's Records Custodian, that "I believe the items listed on the receipt may still be in the property room." Yet neither Ms. Brians nor anyone else at TPD or the City of Tulsa produced the evidence to Mr. Jamerson or his counsel.

226.     Starting in 2018, Defendant Assistant City Attorney Becky Johnson repeatedly, falsely claimed the DNA evidence from Jamerson's criminal case had been destroyed and expressly refused to even look for the evidence, stating "we decline your request to inspect the Tulsa Police Department Laboratory and/or Property Room to search for a piece of evidence that we are certain we have destroyed, to wit, the sexual assault kit from property receipt AA9462."

227.     In 2020, Defendant Whitehead, a supervisor at the TPD property room, falsely testified under oath that she conducted a diligent effort "to locate any possible evidence" from Jamerson's criminal case. Although Lt. Whitehead "testified that she has looked through everything that she can possibly think of," she claimed she could not locate the evidence that Jamerson's counsel was later able to locate the first time he ever set foot in the TPD property room. Repeating Lt. Whitehead's false claim that she had conducted a thorough but fruitless search, the Tulsa County District Attorney's Office falsely told Jamerson's counsel and the Tulsa

County District Court that "the items requested for testing no longer exist." The District Attorney's Office further claimed that "there is no reason to doubt the City of Tulsa [sic] diligence in failing to locate Petitioner's evidence."

228. In the summer of 2022, the City of Tulsa and TPD were desperate to prevent Mr. Jamerson's counsel from conducting his own search of the TPD property room. When informed that such a search was imminent, TPD Captain (now Chief) Dennis Larsen demanded that the City of Tulsa's attorneys put a stop to it. He told Deputy Chief Matthew McCord that if the Tulsa County District Court ordered such a search, TPD should defy any such order.

229. As counsel's search of the property room approached, Defendant James Slay located the "missing" evidence from Mr. Jamerson's case and notified Defendant Micheal Burgess, the TPD Property Room Custodian, of that fact. Lt. Burgess then informed City of Tulsa attorneys Hayes Martin and Kristina Gray, TPD Deputy Chief Matt McCord, TPD Captain Dennis Larsen, TPD Captain Eric Nelson, and Assistant District Attorney Matt Kehoe of her discovery and asked whether this evidence was what Mr. Jamerson was seeking.

230. Despite being informed that this was likely the evidence Jamerson and his counsel were seeking, Lt. Burgess did not produce the evidence or disclose that it had been located. Instead, she ordered Slay to conceal the evidence in a gun vault and allowed the façade of a court-ordered search to go on. Officer Slay hid the evidence as instructed.

231. Assistant City Attorneys Hayes Martin, Kristina Gray, and Becky Johnson participated in coordinating the anticipated search of the TPD property room by Mr. Jamerson's counsel. Although they knew Lt. Burgess had secured the "missing" evidence, they did not disclose the existence of the evidence to Jamerson's counsel.

232.    Similarly, although Lt. Burgess had informed ADA Kehoe and TPD officers Larsen, McCord, and Nelson that she had secured the "missing" evidence, they likewise did not disclose to Mr. Jamerson or his counsel that the evidence had been located.

233.    At a squad meeting prior to counsel's search, Lt. Burgess told the TPD property room personnel about the evidence Officer Slay had found. She instructed the personnel not to disclose the existence of this evidence to Jamerson's counsel. Instead, she directed that personnel should try to make counsel's search of the property room as difficult as possible. TPD officers and evidence room personnel – including without limitation Defendants Burgess, Slay, and Cozad – complied with these instructions and did not intervene to stop this scheme.

234.    On August 17, 2022, Jamerson's counsel and Ms. Fuller conducted their search of the TPD property room. Although TPD Property Room Custodian Micheal Burgess, Assistant District Attorney Matt Kehoe, Assistant City Attorney Hayes T. Martin, and TPD Major Matt McCord were present during the search – and although they all knew TPD had the "missing" evidence in its possession and knew its location – none of them disclosed that information to counsel. Consistent with the plan described by Lt. Burgess, they provided no assistance to counsel.

235.    The DNA evidence that proved Jamerson's innocence would still be hidden to this day – and Jamerson would still be a felon convicted of rape – if his counsel had not demanded to see the original property receipts for the evidence from Jamerson's case during his August 17, 2022, search of the TPD property room. Property receipt #9460 clearly listed "item #6" as a sealed package containing "microscope slides generated during analysis." The property receipt contained a chain of custody log showing that the forensic lab had returned this evidence to the TPD property room in 1997.

236. When Jamerson's counsel demanded to see item #6, the thirty-year conspiracy to hide the evidence from his case finally came to an end. TPD officers retrieved item #6, which included a slide created from the vaginal wash performed during Ms. Davis's rape exam – the same sample the prosecution's witness, forensic chemist Ann Morris, testified contained spermatozoa consistent with coming from Jamerson.

237. The Evidence-Hiding Defendants' conduct was intentional, knowing, reckless, negligent, and/or deliberately indifferent to Jamerson's constitutional rights.

238. The Evidence-Hiding Defendants' conduct offends principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, and transgresses recognized principles of fundamental fairness in operation.

239. As a direct and proximate result of the failure of the Evidence-Hiding Defendants to register, store, preserve, maintain, control, and produce material and critical evidence relating to the crime for which Jamerson was convicted, Mr. Jamerson needlessly endured 14 additional years of incarceration, plus 9 years of living as a convicted felon and registered sex offender. During these events, Mr. Jamerson endured substantial physical, emotional, and pecuniary injuries as described herein.

240. The Evidence-Hiding Defendants are each liable personally for these acts that damaged Jamerson.

241. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against the Evidence-Hiding Defendants for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

**COUNT V**

**SUBSTANTIVE DUE PROCESS:**
**BAD FAITH DENIAL OF POST-CONVICTION ACCESS**
**TO EXCULPATORY EVIDENCE**

242.     Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

243.     The Evidence-Hiding Defendants, acting within the scope of their employment and under color of state law, deliberately denied to Mr. Jamerson evidence that could have formed a basis for exonerating him.

244.     Although the evidence existed, the Evidence-Hiding Defendants infringed on Jamerson's due process rights by failing to produce evidentiary material that could have been subjected to DNA testing tests, the results of which would have exonerated him.

245.     In denying Jamerson access to this evidence, the Evidence-Hiding Defendants acted in bad faith.

246.     The conduct of the Evidence-Hiding Defendants shocks the conscience, offends principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, and transgresses recognized principles of fundamental fairness in operation.

247.     As a direct and proximate result of the Evidence-Hiding Defendants' deliberate withholding of exculpatory evidence post-conviction, Mr. Jamerson needlessly endured 14 additional years of incarceration, plus 9 years of living as a convicted felon and registered sex offender. During these events, Mr. Jamerson endured substantial physical, emotional, and pecuniary injuries as described herein.

248.     The Evidence-Hiding Defendants are each liable personally for these acts that damaged Jamerson.

249.     Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against the Evidence-Hiding Defendants for damages totaling in excess of Seventy-Five

Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT VI

## MUNICIPAL LIABILITY:
## CITY OF TULSA

250.     Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

251.     As described more fully herein, Defendants City of Tulsa and TPD are themselves liable for the violation of Mr. Jamerson's constitutional rights. Defendants TPD and the City of Tulsa – acting knowingly, intentionally, recklessly, negligently, or with deliberate indifference – maintained, *inter alia*, the following unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices that were the moving force behind or closely related to violations of Henry Jamerson's constitutional rights.

### *Systemic Failures in Investigations, Identification of Suspects, and Production of Evidence:*
### *Unconstitutional Policies, Customs, and Practices*

252.     The actions of Defendants Hunter, Daniels, Witt, and Morris described herein were undertaken pursuant to the policies and practices of the City of Tulsa and TPD. TPD officers regularly used unconstitutional measures during the relevant time periods to falsely implicate criminal suspects. These practices included withholding or suppressing material exculpatory evidence from prosecutors, fabricating falsely inculpatory evidence, manipulating witnesses, engaging in unduly suggestive identification and lineup procedures, and presenting false evidence to courts reviewing investigations, arrests, and detention of suspects. TPD officers also regularly observed their colleagues engaging in these unconstitutional practices, yet did not

intervene to stop them, as required by law. These were widespread, clear, and persistent patterns and practices of officers in the Tulsa Police Department in the years around and leading up to Mr. Jamerson's 1991 conviction.

253. At all times relevant herein, the City of Tulsa and TPD had no policies or wholly inadequate policies, procedures, rules, or regulations relating to police officers' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory or impeachment evidence. The City of Tulsa and TPD deliberately chose not to adopt any or minimally adequate policies on officers' obligations to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), even though the need for such policies was obvious and the likelihood of recurring violations was clear. To the extent TPD had such written policies, procedures, or guidelines, they were neither followed nor enforced.

254. At all times relevant herein, the City of Tulsa and TPD had no policies or wholly inadequate policies, procedures, rules, or regulations regarding the execution of lawful investigations, constitutionally adequate interview and interrogation techniques, the conduct of lineups, the creation of drawings of suspects, the writing of police reports, or the duty to intervene to prevent violations of constitutional rights by other officers. The City of Tulsa and TPD deliberately chose not to adopt any or adequate policies to govern these recurring issues, even though the need for such policies was obvious and the likelihood of recurring violations was clear. To the extent TPD had such written policies, procedures, or guidelines, they were neither followed nor enforced.

255. The failure to maintain and enforce adequate policies on these topics posed an obvious risk of violation of the constitutional rights of Mr. Jamerson and other criminal defendants. This failure to maintain and enforce adequate policies therefore constituted deliberate indifference on the part of the City of Tulsa and TPD.

256.     At all times relevant herein and for a period of time prior thereto, final policymakers at the City of Tulsa and TPD had actual or constructive notice of a widespread practice by TPD officers under which individuals suspected of criminal activity, such as Mr. Jamerson, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and/or were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

257.     Final policymakers for the City of Tulsa and TPD on matters relating to the police department had actual or constructive notice that their existing policies were outdated and needed to be updated to include adequate policies on how to handle, preserve, and disclose exculpatory and impeachment evidence, how to conduct lineups or other identification procedures, how to write police reports or notes of witness statements, and the legal duty to intervene to prevent violations of constitutional rights by other officers.

258.     Final policymakers for the City of Tulsa and TPD on matters relating to the police department had actual or constructive notice that their existing policies regarding how to handle, preserve, and disclose exculpatory and impeachment evidence, how to conduct lineups or other identification procedures, how to write police reports or notes of witness statements, and the legal duty to intervene to prevent violations of constitutional rights by other officers, were not being followed or enforced.

259.     Final policymakers for City of Tulsa and TPD had actual or constructive notice before 1991 that their policies were likely to lead to constitutional violations by police officers and needed to be revised to ensure that officers complied with the law.

260.     These widespread practices were so well-settled as to constitute de facto policy in the Tulsa Police Department, and they were allowed to exist because municipal policymakers

with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

261. The policies and practices of the City of Tulsa and TPD were the moving force behind the violation of Mr. Jamerson's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City of Tulsa and TPD directly encouraged the very type of actions at issue by failing to adopt, implement, and enforce adequate policies, procedures, rules, or regulations regarding the conduct of lineups, the writing of police reports, the duty to avoid using unduly suggestive identification procedures, the writing of police reports, the duty not to fabricate evidence, the duty to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and the legal duty to intervene to prevent violations of constitutional rights by other officers.

262. The City of Tulsa is liable because the violations of Mr. Jamerson's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for the City of Tulsa.

263. As a direct and proximate result of the City of Tulsa's actions – and its policy of inaction – Mr. Jamerson's constitutional rights were violated and he suffered injuries and damages as set forth herein.

***Systemic Failures in Investigations, Identification of Suspects,
and Production of Evidence:***

### ***Failure to Train***

264. At all times relevant herein, the City of Tulsa and TPD did not provide any or minimally adequate training or supervision to TPD officers with respect to their obligation to disclose exculpatory and impeachment evidence, the conduct of lineups or identification procedures, the writing of police reports and notes on witness statements, or their legal duty to

intervene when they observed other officers violating the rights of criminal defendants. Indeed, the City of Tulsa has admitted that it had no policies whatsoever on disclosure of exculpatory evidence and witness interviews as of 1991.

265.    City of Tulsa policymakers knew to a moral certainty that its employees would confront situations in which they would have to decide whether to disclose exculpatory and impeachment evidence, what procedures to use in identifying suspects, how to conduct lineups, how to prepare police reports and notes on witness statements, and whether to intervene when they observed other officers violating the rights of criminal defendants. These situations present police officers with difficult choices of the sort that training or supervision make less difficult. Making the wrong choices will frequently cause the deprivation of citizens' constitutional rights.

266.    The constitutional violations complained of by Mr. Jamerson were a highly predictable and plainly obvious consequence of a failure to equip TPD officers with the specific tools – including policies, training, and supervision – to handle the recurring situations of executing lawful investigations, constitutionally adequate interview and interrogation techniques, conducting lineups, creating drawings of suspects, writing police reports, disclosing exculpatory or impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), avoiding the fabrication of evidence, and intervening when they observed other officers violating the rights of criminal defendants.

267.    In and prior to 1991, City of Tulsa policymakers had actual or constructive notice of the need for training. Based on a pattern of constitutional violations by untrained employees, final policymakers for the City of Tulsa on matters relating to TPD had actual or constructive notice that, among other things, there was a need to train and supervise police officers and that their existing training was outdated and needed to be updated to include adequate training on how to execute lawful investigations, use constitutionally adequate interview and interrogation

techniques, conduct lineups, write police reports, create drawings of suspects, disclose exculpatory or impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), avoid the fabrication of evidence, and intervene when they observed other officers violating the rights of criminal defendants

268.     At all times relevant herein, final policymakers had actual or constructive notice of these problems, allowed them to continue, and decided not to implement adequate training, supervision, or discipline, which constituted a policy of inaction. By failing to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or citizens' constitutional rights, who fabricated evidence or manipulated witnesses or created unduly suggestive lineups, or who failed to intervene when they observed other officers violating the rights of criminal defendants, the City of Tulsa's policy of inaction led officers to understand they could violate citizens' constitutional rights with impunity.

269.     At all times relevant herein, final policymakers had actual or constructive notice that its actions and failure to act were substantially certain to result in constitutional violations. Yet they consciously or deliberately chose to disregard the risk of harm.

270.     The policies and practices of the City of Tulsa and TPD were the moving force behind the violation of Mr. Jamerson's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City of Tulsa directly encouraged the very type of actions at issue by failing to adequately train, supervise, and discipline their officers who withheld exculpatory evidence, fabricated false evidence and witness testimony, pursued wrongful prosecutions and convictions, and failed to intervene when they observed other officers violating the rights of criminal defendants.

271.     The injuries Jamerson suffered were obvious and closely related to the City of Tulsa's and TPD's policies, customs, or practices of providing deficient training to TPD officers.

272.     The City of Tulsa is liable because the violation of Jamerson's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for the City of Tulsa.

273.     As a direct and proximate result of the City of Tulsa's actions, Mr. Jamerson's constitutional rights were violated and he suffered injuries and damages as set forth herein.

### *Systemic Failures in the Handling of Evidence:*
### *Unconstitutional Policies, Customs, and Practices*

274.     Under Oklahoma law – including without limitation 22 O.S. § 1372 and 22 O.S. § 1373.2 – when a defendant is convicted of a violent felony, TPD and the City of Tulsa have and had a legal duty to retain and preserve the biological evidence from the case, to provide an accurate inventory of all evidence related to the case, and to ensure an adequate chain of custody for that evidence. Oklahoma's laws create a liberty interest in proving a prisoner's innocence with DNA evidence.

275.     The City of Tulsa and TPD violated Mr. Jamerson's constitutional rights by implementing policies, customs, and practices that created a recklessly chaotic evidence management system, which undermined the State's procedures by providing a fundamentally inadequate process of accessing evidence post-conviction, including without limitation:

- The City of Tulsa and TPD maintained either no or wholly inadequate written Standard Operating Procedures and lacked an effective system of tracking and storing DNA evidence. The lack of adequate procedures and supervision created a culture in which DNA evidence was intentionally or erroneously lost, destroyed, or withheld;

- To the extent the City of Tulsa and TPD had facially adequate policies governing the tracking and storing of DNA evidence, those policies were neither followed nor enforced;

- The City of Tulsa's and TPD's policies, customs, and/or practices created a system of evidence storage and tracking that created obvious conflicts of interest. It was obvious that this system created unacceptable risk of mishandling of evidence and violating

defendants' constitutional rights, but the City of Tulsa and TPD retained the system with deliberate indifference toward that risk. As a result of this untrustworthy system, the civilians in TPD's forensic lab did not trust the sworn officers to properly store and track evidence from criminal cases. The result was complete disorganization within both the property room and the lab, which predictably and inevitably caused evidence to be lost and allowed evidence to be hidden;

- The City of Tulsa and TPD failed to implement and enforce policies and standards that would ensure an organized process of transferring evidence. As a result, evidence was transferred without a clear chain of custody. It was obvious that this absence of policies and procedures created a serious risk of losing evidence, but the City of Tulsa and TPD continued to maintain these deficient procedures with deliberate indifference to that risk;

- TPD and the City of Tulsa commingled stolen goods with evidence from criminal trials. This practice resulted in critical evidence being destroyed, despite lab employees urging TPD property room employees to retain all biological materials;

- The City of Tulsa's and TPD's final policymakers knowingly hired and retained crime lab personnel – including multiple laboratory directors – with documented histories of serious mishandling of evidence;

- The City of Tulsa and TPD had a custom, policy, or pattern and practice of withholding DNA evidence post-conviction.

276.     This failure to maintain and enforce adequate policies posed an obvious risk of violating the rights of Mr. Jamerson and other criminal defendants. This failure to maintain and enforce adequate policies therefore constituted deliberate indifference on the part of the City of Tulsa and TPD.

277.     The failure of the City of Tulsa and TPD to establish an adequate system for accessing evidence post-conviction offends principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental and transgress any recognized principle of fundamental fairness in operation.

278.     Final policymakers at the City of Tulsa and TPD were on actual or constructive notice of the systemic breakdowns of custody and control of evidence and the routine mishandling of evidence, yet they took no steps or wholly inadequate steps to implement and

enforce adequate policies to ensure the appropriate storage, handling, tracking, and production of evidence.

279.    Policymakers at the City of Tulsa and TPD policymakers had actual or constructive notice that the deficient policies and practices described herein caused evidence to be routinely lost, hidden, or withheld, in violation of criminal defendants' right to access evidence post-conviction.

280.    Final policymakers for City of Tulsa and TPD had actual or constructive notice that their policies were inadequate and outdated, likely to lead to violations of criminal defendants' constitutional rights, and needed to be revised to ensure that City of Tulsa and TPD employees complied with the law.

281.    To the extent the City of Tulsa and TPD had facially adequate policies governing the tracking and storing of DNA evidence, those policies were neither followed nor enforced. Final policymakers for City of Tulsa and TPD had actual or constructive notice that those policies were not being followed or enforced, and that this was likely to lead to violations of criminal defendants' constitutional rights.

282.    The widespread practices were so well-settled as to constitute de facto policy in the Tulsa Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

283.    The policies and practices of the City of Tulsa and TPD were the moving force behind the violation of Mr. Jamerson's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City of Tulsa and TPD directly encouraged the very type of actions at issue by failing to adopt, implement, and enforce adequate

policies, procedures, rules, or regulations regarding the storage, handling, tracking, and production of evidence.

284.    The City of Tulsa is liable because the violation of Mr. Jamerson's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for the City of Tulsa.

285.    As a direct and proximate result of the City of Tulsa's actions – and its policy of inaction – Mr. Jamerson's constitutional rights were violated and he suffered injuries and damages as set forth herein.

***Systemic Failures in the Handling of Evidence:***
***<u>Failure to Train</u>***

286.    The City of Tulsa and TPD had a custom, policy, or pattern and practice of failing to properly supervise, train, and discipline officers concerning the storage, cataloging, and disclosure obligations for DNA evidence.

287.    TPD personnel systematically destroyed, lost, or secreted evidence, and showed deliberate indifference to the rights of criminal defendants to access evidence.

288.    Based on this pattern of constitutional violations by untrained employees, final policymakers for the City of Tulsa on matters relating to TPD had actual or constructive notice that there was a need to train and supervise police officers and that their existing training was outdated and needed to be updated to include adequate training on how to properly store, handle, track, and produce evidence.

289.    Based on this pattern of constitutional violations by untrained employees, policymakers at the City of Tulsa and TPD were on actual or constructive notice of the systemic breakdowns of custody and control of evidence and the routine mishandling of evidence. Yet they took no steps or wholly inadequate steps to discipline lab supervisors or property room

74

employees, to train them on their constitutional obligations, or to conduct any meaningful review of their past or ongoing work for similar misconduct. Instead, the City of Tulsa's and TPD's policymakers repeatedly, knowingly hired and retained crime lab personnel – including laboratory directors – with documented histories of serious mishandling of evidence.

290. By deciding not to implement any legitimate mechanism for oversight or punishment of officers who mishandled, lost, destroyed, or failed to produce evidence, the City of Tulsa and TPD caused officers to understand that they could violate citizens' constitutional rights with impunity.

291. The City of Tulsa's and TPD's customs, policies, and practices relating to the training of TPD employees created obvious risks of (a) the repeated destruction, loss, secreting, and/or withholding of material criminal evidence, (b) violating the rights of criminal defendants, and (c) wrongfully denying convicted defendants evidence that could prove their innocence, in violation of State law. Yet the City of Tulsa and TPD consciously or deliberately chose to disregard the known or obvious consequences of its actions.

292. The policies and practices of the City of Tulsa and TPD were the moving force behind the violation of Mr. Jamerson's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the City of Tulsa directly encouraged the very type of actions at issue by failing to adequately train, supervise, and discipline their officers who destroyed, lost, or secreted evidence.

293. As a direct and proximate result of the City of Tulsa's and TPD's unconstitutional customs, policies, practices, and/or indifferent employee training and supervision practices, Mr. Jamerson was wrongfully imprisoned for 14 years (from his initial demand for his DNA evidence in 2001 to the completion of his sentence in 2015), and forced to live as a convicted felon and

registered sex offender for an additional 9 years. During these events, Mr. Jamerson endured substantial physical, emotional, and pecuniary injuries as described herein.

294.    Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendants TPD City of Tulsa for damages totaling in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT VII

### MUNICIPAL LIABILITY:
### COUNTY OF TULSA

295.    Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

296.    Tulsa County, acting through the Tulsa County District Attorney's Office, routinely participated in investigations into potentially exculpatory evidence and exercised administrative oversight of those investigations.

297.    The County and District Attorney's Office had a policy, custom, or practice of engaging in these purported investigations in a manner that deprived convicted defendants of their rights under Oklahoma law to have potentially exculpatory evidence submitted for forensic testing.

298.    The County and District Attorney's Office had a policy, custom, or practice of purporting to conduct thorough searches for evidence from defendants' criminal cases, when in fact they conducted no meaningful investigations. While making no good faith effort to locate such evidence, District Attorney's Office personnel would falsely inform defendants, their counsel, and the Tulsa County District Court that they had searched diligently for the evidence and had been unable to locate it.

299.     In exercising these administrative and/or investigative functions, the County and District Attorney's Office acted deliberately, recklessly, or with deliberate indifference to the rights of criminal defendants to obtain evidence from their criminal cases and to submit that evidence for forensic testing that might establish their innocence.

300.     These were widespread, clear, and persistent patterns and practices of the Tulsa County District Attorney's Office personnel in the years before and during Mr. Jamerson's demands for the evidence from his criminal case. These practices were carried out by multiple members of the District Attorney's Office and persisted for more than a decade with District Attorney Kunzweiler's knowledge, ratification, and/or participation.

301.     The handling of Cedrick Courtney's repeated requests for evidence from his criminal trial offers one example of the District Attorney's Office's policy, custom, or practice of deliberate indifference in overseeing the production of evidence from criminal cases. Beginning in 2000, Mr. Courtney repeatedly sought evidence from his 1996 trial. Just as in Jamerson's case, Mr. Courtney and his attorneys were repeatedly told the evidence had been destroyed. Just as in Jamerson's case, these claims were false. In fact, the District Attorney's Office had possession of that evidence the entire time. Although the evidence was easily located in the court file from Courtney's criminal case, District Attorney's Office personnel had either failed to look for it or had located it and declined to produce it. As a result of the County's deliberate indifference, Mr. Courtney spent an additional 10 years in prison.

302.     Although final policymakers at the County had actual or constructive notice that its personnel had either not conducted a good faith search for exculpatory evidence or had deliberately hidden that evidence, the County took either no steps or wholly inadequate steps to discipline its employees, implement necessary training, or otherwise ensure that these problems did not recur.

303.     Final policymakers at the County also had actual or constructive notice that they had either no policies or wholly inadequate policies governing their personnel's conduct of investigations into evidence and/or their exercise of administrative oversight of such investigations. To the extent the County had such policies, final policymakers had actual or constructive notice that they were routinely not enforced. These final policymakers had actual or constructive notice that these deficiencies posed an obvious risk to the rights of defendants – as evidenced by, inter alia, Mr. Courtney's entirely unnecessary decade spent in prison. Yet, with deliberate indifference to the rights of defendants, the County chose not to adopt, implement, and/or enforce minimally adequate policies to protect those rights.

304.     Consistent with the widespread practices of the District Attorney's Office during this time, in 2013 ADA Jimmy Dunn told wrongfully convicted defendant Michelle Murphy that critical blood evidence from her case could not be located. ADA Dunn falsely claimed the blood could not be located because it had been stored under the name "Lee William" instead of "William Lee." But when that blood was eventually produced, it was packaged in an envelope labeled "Two Tubes of Blood William M. Lee" and marked with the same case number that OIDS had provided in 2004. Dunn later told Murphy and her counsel they were "lucky" that Lee's blood and semen had not been destroyed.

305.     In December 2013, Murphy's counsel met with ADA Dunn and Assistant City Attorney Michelle McGrew at the TPD property room to examine evidence related to William Lee. During that meeting, Murphy's counsel was handed an evidence log, attached to which was a memo that counsel believed warned TPD that cooperation with Ms. Murphy would cause the City to be sued.

306.     As a result of the County's customs and practices of deliberate indifference toward Murphy's legal right to access evidence post-conviction, Murphy needlessly spent an additional

10 years in prison. Just as in Jamerson's case, the evidence that would prove her innocence sat in TPD's custody that entire time.

307.    By the time Mr. Jamerson's counsel filed a Motion Requesting Retesting of DNA Evidence in the Tulsa County District Court in 2019, final policymakers at the County had been on actual or constructive notice of the District Attorney's Office's policies, practices, and customs of deliberate indifference for many years. These final policymakers had actual or constructive notice that these policies, practices, and customs had repeatedly caused wrongfully convicted defendants to needlessly spend decades in prison. Yet the County took either no steps or wholly inadequate steps to discipline its employees, implement necessary training, implement or enforce minimally adequate policies, or otherwise ensure that these problems did not recur. Instead, the District Attorney's Office continued to engage in these practices for years as Jamerson sought the evidence that would ultimately exonerate him.

308.    The physical evidence from Mr. Jamerson's case was in TPD's possession. Locating it was as simple as looking at the original property receipts associated with Mr. Jamerson's case. The slides that proved Jamerson's innocence were exactly where the property receipt indicated they were. Yet District Attorney's Office personnel repeatedly, falsely claimed they had overseen "thorough" searches for the evidence and could not locate it.

309.    When Jamerson's counsel submitted his Motion Requesting Retesting of DNA Evidence in 2019, the District Attorney's Office declined to search for the evidence. Instead, District Attorney Steve Kunzweiler and Assistant District Attorney Randall Young falsely told the Court that "the items requested for testing no longer exist."  Kunzweiler and Young further assured the Court that "there is no reason to doubt the City of Tulsa [sic] diligence in failing to locate Petitioner's evidence."

310.     While providing administrative oversight of the response to counsel's requests for the evidence from Jamerson's trial, Assistant District Attorney Randall Young purportedly oversaw "a thorough search" for the evidence. Again, locating this evidence did not even require any meaningful "search." It merely required looking at the original property receipts from the case and retrieving the evidence from the location listed on the receipts. Yet ADA Young told Jamerson's counsel TPD could not locate the evidence and did not have it.

311.     On August 28, 2020, Mr. Young again insisted that TPD and the District Attorney's Office had conducted a thorough search. In a sworn statement, Mr. Young represented to the Court that "[t]he undersigned has worked closely with counsel, the City of Tulsa's counsel, and Tulsa Police Department's Property Division to conduct an accurate inventory of the evidence as required by statute."

312.     On November 4, 2020, the Tulsa County District Court held a hearing on Jamerson's motion seeking the DNA evidence. At that hearing, ADA Dunn sought to persuade the Court not to allow Jamerson's counsel to conduct his own search of TPD's property room by repeatedly insisting the Court should simply accept TPD's claims that they had conducted an exhaustive search for the evidence:

> I mean, we have had Officer Whitehead, who testified that she has looked through everything that she possibly can think of. . . If TPD's word is not good enough, then in every single one of these cases, the people are going to say, "I want to go look for myself. I don't trust you." . . . I don't know what else can be done. If their word isn't going to be good enough, when will it ever be?

313.     At that same hearing, ADA Dunn dismissed the District Attorney's Office's failure to produce the evidence in Cedrick Courtney's case as merely "a fluke."

314.     If the Court had trusted ADA Dunn, the evidence that proved Jamerson's innocence would still be hidden in TPD's property room and Jamerson would still be a convicted

felon. Instead, the Court issued a minute order stating "COURT ORDERS STATE TO PRODUCE CHAIN OF COMMAND AND TRACIS TO PETITIONER WITHIN 15 DAYS."

315.    Rather than sending all property receipts from Jamerson's case, however, Assistant District Attorney Jimmy Dunn provided only Property Receipt #AA9462. He did not produce Property Receipt #AA9460, which contained the evidence that would eventually prove Jamerson's innocence.

316.    On February 10, 2021, Mr. Dunn represented that he had "spoken with the Court Clerk's Office supervisor out at the warehouse and he is look [sic] to see if he can locate any of the evidence that may have been introduced in Mr. Jamerson's case." Neither Dunn nor his successor ever reported the results of that alleged search.

317.    Stretching at least as far back as 2000 – when the District Attorney's Office failed to produce the evidence from Cedrick Courtney's criminal case – the County's policies, practices, and customs of deliberate indifference continued into 2022. On May 13, 2022, Assistant District Attorney Matt Kehoe again falsely claimed the evidence from Jamerson's case had been destroyed. Kehoe informed Jamerson's counsel that in the course of his investigation into the evidence, the TPD Property Room had reported to him that "the property, despite being listed in their records system, was not located at any of TPD's locations where property is stored." Kehoe stated that "[a]t this point I have exhausted all my resources and possible information as to the location of this item, and have not been able to locate it or adequately establish a chain of custody."

318.    Just two months after making this claim, TPD officers secured the "missing" evidence from Jamerson's case prior to a court-sanctioned search of the TPD evidence room by Jamerson's counsel. Yet although ADA Kehoe oversaw the preparations for counsel's search and

knew that the evidence had been located, he declined to notify Jamerson's counsel of that fact. Instead, under the direction and authority of ADA Kehoe, Defendants Burgess and Slay hid the evidence in a gun safe prior to counsel's search.

319. These widespread practices – which persisted for at least 22 years and involved multiple ADAs and the District Attorney himself – were so well-settled as to constitute de facto policy in Tulsa County, and they were allowed to exist because County policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

320. The policies and practices of the County were the moving force behind the violation of Mr. Jamerson's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the County directly encouraged and participated in the very type of actions at issue by failing to adopt, implement, and enforce adequate policies, procedures, rules, regulations, and/or training regarding investigating evidence and/or exercising administrative oversight of such investigations.

321. The County is liable because the violation of Mr. Jamerson's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for the County.

322. As a direct and proximate result of the County's actions – and its policy of inaction – Mr. Jamerson's constitutional rights were violated and he suffered injuries and damages as set forth herein.

323. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendant County of Tulsa for damages totaling in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT VIII

## CONSPIRACY TO VIOLATE CIVIL RIGHTS:
## THE MALICIOUS PROSECUTION DEFENDANTS

324.    Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

325.    Defendants Hunter, Daniels, Witt, and Morris (collectively, the "Malicious Prosecution Defendants"), acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert to cause the arrest, prosecution, and conviction of Henry Jamerson for a crime he did not commit. The Malicious Prosecution Defendants agreed to achieve these goals by fabricating inculpatory evidence and withholding exculpatory evidence, as described more fully herein. In so doing, these co-conspirators conspired, and had a meeting of the minds, to accomplish an unlawful purpose by unlawful means.

326.    In furtherance of this ongoing conspiracy, each of the Malicious Prosecution Defendants engaged in and facilitated numerous overt acts, including without limitation:

- Defendants Hunter, Daniels, and Witt used suggestive conduct to induce the victim to misidentify Mr. Jamerson as her assailant;

- Defendants Daniels and Hunter skewed the investigation toward Jamerson, ignored credible leads provided by witnesses, and failed to investigate other suspects;

- on information and belief, Defendants Hunter and Daniels agreed to use their photograph of Jamerson to persuade Ms. Davis to identify Jamerson as her assailant;

- on information and belief, Defendant Witt created a "composite drawing" after having seen the photograph of Jamerson – and only Jamerson – and knowing he was the lone suspect;

- after completing the purported "composite drawing," Defendant Daniels showed the victim and sole witness the photo of Jamerson and told her the drawing was a "perfect match" of the photo of Jamerson;

- Defendants Daniels repeatedly showed the victim the photo of Jamerson and told her TPD had conclusively identified him as her assailant;

- on information and belief, Defendants Hunter and/or Witt affirmed to Davis that TPD had conclusively identified Jamerson as her assailant.

- Defendant Daniels conducted an alleged photo lineup only after repeatedly showing the victim the photo of Jamerson and telling her they had conclusively identified him as her assailant;

- Daniels – who was investigating the assault and who had a photograph of Jamerson (and no other suspect) in her possession – conducted the alleged photo lineup herself, rather than using a neutral "blind administrator;"

- Daniels showed the victim and sole witness a photo array consisting of only 5 photos;

- apart from Jamerson's photo, Daniels included in the alleged photo lineup only photos of men who were much taller and heavier than Jamerson, and who therefore bore much less resemblance to the victim's description of her assailant;

- Daniels pressured the victim to make an identification of Jamerson despite her statements that she "wasn't sure" and "wasn't going to blame anybody" because she had "just caught a glimpse of him;"

- Daniels told the victim that Mr. Jamerson had previously worked at Ma Bell's, thereby enhancing the credibility of their claim that he was the man who had attacked her there;

- Defendants Daniels and Hunter created and shared with prosecutors police reports that falsely claimed Ms. Davis had independently identified Jamerson as her assailant, and omitted critical exculpatory evidence relating to the unduly suggestive tactics they had used to convince Davis to misidentify Jamerson;

- on information and belief, Defendant Witt altered the "composite drawing" without the victim's knowledge prior to trial;

- Defendant Morris fabricated a lab report to support the false claim that Jamerson could be the source of spermatozoa found in the victim's vagina during her rape exam;

- prior to trial, Defendant Daniels falsely told the victim that Jamerson's semen had been found in her vagina during her rape exam, which conclusively confirmed their identification of Jamerson as her assailant;

- at trial, Defendant Morris falsely testified that serology test results showed that Jamerson could be the source of spermatozoa found in the victim's vagina during her rape exam;

- Defendant Daniels destroyed or secreted material and critical evidence, including without limitation TPD's sole recorded interview with Ms. Davis, TPD's recorded interview with Antonio Johnson, and the photographs purportedly shown to Ms. Davis during an alleged photo lineup.

327. The foregoing conduct operated to deprive Mr. Jamerson of important and well established rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of Oklahoma, including Jamerson's right not to be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to be free from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.

328. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth.

329. As a direct and proximate result of the Malicious Prosecution Defendants' unlawful conspiracy, Henry Jamerson was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction, wrongfully imprisoned for twenty-four years, and then forced to live as a convicted felon and registered sex offender for an additional nine years.

330. Defendants Hunter, Daniels, Witt, and Morris are each liable personally for these acts that damaged Jamerson.

331. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against each of Defendants Hunter, Daniels, Witt, and Morris for damages totaling in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of

filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT IX

### CONSPIRACY TO VIOLATE CIVIL RIGHTS: THE EVIDENCE-HIDING DEFENDANTS

332. Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

333. Defendants Dennis Larsen, Becky Johnson, Hayes Martin, Micheal Burgess, James Slay, Kathleen Whitehead, Jon Cozad, and Tara Brians (collectively, the "Evidence-Hiding Defendants"), acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert to deprive Mr. Jamerson of his right to Due Process. In doing so, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means.

334. In furtherance of this ongoing conspiracy, each of the Conspiracy Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

- Defendant Daniels destroyed or secreted: (1) the recording of TPD's interview of Antonio Johnson, and (2) the photographs (apart from Jamerson's) that she allegedly showed to Ms. Davis during the purported photo lineup;

- Defendants Johnson and Brians falsely claimed critical, material evidence from Jamerson's case had been destroyed;

- Defendants Johnson, Martin, Brians, and Whitehead refused to conduct a good faith search for the evidence from Jamerson's criminal case;

- Defendants Johnson, Martin, Brians, and Whitehead each falsely claimed TPD and the City of Tulsa had conducted a good faith search for the evidence from Jamerson's criminal case, despite the fact that they knew or should have known this was false;

- After Defendant Slay took control of the ostensibly "missing" evidence, Defendants Burgess and Slay agreed to remove that evidence and hide it in a gun locker shortly

before Jamerson's counsel would be conducting a court-sanctioned search of TPD's property room;

- Defendants Martin, Burgess, Slay, and Cozad knew Lt. Burgess had located the evidence and had control of it. But these Defendants agreed not to disclose that evidence to Jamerson's counsel or to the Tulsa County District Court. Instead, they agreed to allow Jamerson's counsel to conduct a search of TPD's property room, knowing that the evidence was already in their control;

- Upon locating the "missing" evidence, Lt. Burgess immediately informed then-Captain (now Chief) Larsen of her finding. On information and belief, just days later – two weeks before counsel's search of the property room – Larsen and Burgess met and discussed the evidence she had located and their strategy for handling counsel's search. On information and belief, they agreed not to disclose the existence of the evidence to counsel and to instead allow the sham search to go forward.

- On August 14, 2022, Assistant City Attorney Martin wrote an email to Jamerson's counsel. Although Lt. Burgess had informed Martin that she had located additional evidence from Jamerson's case, Martin did not disclose that to counsel. While Martin claimed he was attaching to his email "the records in [his] possession," in fact he withheld the records related to property receipt #AA9460 – records that Lt. Burgess had sent to Martin just two weeks earlier and which they had discussed at length. This was part of a pattern among the co-conspirators to withhold information about AA9460 from counsel. Rather than informing counsel that the evidence he sought had been located, Martin sent counsel procedures that the Evidence-Hiding Defendants had agreed on for counsel's search.

- At a squad meeting prior to counsel's search, Defendant Burgess told the TPD property room personnel about the evidence Defendant Slay had located. She instructed the TPD employees not to disclose the existence of this evidence to Jamerson's counsel. Instead, she directed that TPD personnel should try to make counsel's search of the property room as difficult as possible. TPD personnel agreed and acted in accordance with Burgess's plan.

335.    The misconduct described in this Count was objectively unreasonable and was undertaken with reckless indifference to the rights of others.

336.    The foregoing conduct operated to deprive Mr. Jamerson of his right to Due Process. The deliberate indifference of the Evidence-Hiding Defendants directly and proximately caused Jamerson to spend twenty-four years in prison and nine additional years as a convicted felon and registered sex offender. During this time, Mr. Jamerson endured substantial physical, emotional, and pecuniary injuries detailed above.

337. Each of the Conspiracy Defendants is liable personally for these acts that damaged Jamerson.

338. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against each of the Evidence-Hiding Defendants for damages totaling in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

## COUNT X

## FAILURE TO INTERVENE

339. Mr. Jamerson realleges and incorporates by reference his allegations in each paragraph of this Complaint and further alleges as follows:

340. During the constitutional violations described herein, Defendants Hunter, Daniels, Witt, Larsen, Burgess, Slay, and Cozad had actual or constructive knowledge that City of Tulsa and TPD personnel were violating Mr. Jamerson's constitutional rights. Any reasonable officer would recognize that the conduct these Defendants witnessed violated Mr. Jamerson's constitutional rights.

341. Defendants Hunter, Daniels, Witt, Larsen, Burgess, Slay, and Cozad had ample opportunities to intervene to prevent or stop these constitutional violations.

342. Nevertheless, Defendants Hunter, Daniels, Witt, Larsen, Burgess, Slay, and Cozad stood by without intervening to prevent the violation of Jamerson's constitutional rights.

343. As a result of the failure of these Defendants to intervene to prevent the violation of Jamerson's constitutional rights, Jamerson suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as described herein.

344. Each of these Defendants is liable personally for these acts that damaged Jamerson.

345. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiff Henry Jamerson demands judgment against Defendants Hunter, Daniels, Witt, Burgess, Slay, and Cozad for damages totaling in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, plus attorney fees, costs, expenses, and any other relief this Court deems just and proper.

**WHEREFORE,** based on the foregoing, Plaintiff William Henry Jamerson prays that this Court grant him the relief sought, including, but not limited to, actual damages and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

**SMOLEN & ROYTMAN,**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com

***Attorneys for Plaintiff***